1  Christopher N. Manning (pro hac vice)
   Edward C. Reddington (pro hac vice)
2  Juli Ann Lund (pro hac vice)
   Tracey A. Fung (pro hac vice)
3  David Berman (pro hac vice)
4  Williams & Connolly LLP
   725 Twelfth Street, N.W.
5  Washington, DC 20005
6  Telephone:    (202) 434-5000
   Facsimile:    (202) 434-5029
7  cmanning@wc.com
   ereddington@wc.com
8  jlund@wc.com
9  tfung@wc.com
   dberman@wc.com
10

11  L. Eric Dowell (AZ Bar No. 011458)
12  OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    2415 East Camelback Road, Suite 800
13  Phoenix, Arizona 85016
    Telephone:   (602) 778-3700
14  Facsimile:   (602) 778-3750
15  eric.dowell@ogletreedeakins.com

16  *Attorneys for Defendant MD Helicopters, Inc.*

17

18              IN THE UNITED STATES DISTRICT COURT

19                 FOR THE DISTRICT OF ARIZONA

20
21  PHILIP A. MARSTELLER and RUTH
    MARSTELLER,                              Case No. CV-14-01788-PHX-DLR
22
                        Plaintiffs,          **DEFENDANT MD HELICOPTERS,**
23                                           **INC.'S MOTION FOR SUMMARY**
                                             **JUDGMENT AND INCORPORATED**
        v.                                   **MEMORANDUM OF POINTS AND**
24                                           **AUTHORITIES**
25  MD HELICOPTERS, INC.,
                                             **FILED UNDER SEAL**
26
                        Defendant.           **ORAL ARGUMENT REQUESTED**
27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

MOTION FOR SUMMARY JUDGMENT..........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

INTRODUCTION................................................................................................................1

FACTUAL BACKGROUND...............................................................................................2

ARGUMENT.......................................................................................................................6

I.   Plaintiff's FCA Retaliation Claim (Count 1) Fails as a Matter of Law. ...................6

   A.   Plaintiff Was Not Engaged in Conduct Protected Under the FCA. .................6

      1.   Plaintiff's Conduct Was Unlawful.......................................................6

      2.   Plaintiff's Allegations Were Not Reasonable.......................................8

   B.   Even If Plaintiff's Conduct Were Protected, the Sole Decisionmaker Had No Knowledge of It at the Time of His Termination. .................................12

   C.   Even If Plaintiff Could Establish a Retaliatory Motive for His Termination, His Claim Would Still Fail for Lack of But-For Causation.........13

II.  Plaintiff's § 2409 Claim (Count 2) Fails as a Matter of Law. .................................14

   A.   Plaintiff Failed To Exhaust His Administrative Remedies, As Required To Bring a § 2409 Claim in Federal Court. ......................................................15

   B.   Plaintiff's § 2409 Claim Independently Fails Due to a Lack of Knowledge and Causation. ...............................................................................17

III. Even if Plaintiff's Retaliation Claims Were Not Defeated by the Undisputed Record, His Damages Claims Would Be Limited by the After-Acquired Evidence Doctrine. ...................................................................................................................18

   A.   The After-Acquired Evidence Doctrine Applies Here. ......................................19

      1.   Plaintiff Was Secretly Trying To Buy MDHI at a "Fire Sale" Price Driven by His Efforts to Undermine the Company................................20

      2.   Plaintiff Revealed—and Continues to Reveal—MDHI's Confidential Information to Non-Governmental Third Parties. ..........21

      3.   Plaintiff Surreptitiously Recorded MDHI Employees. ..........................22

      4.   Plaintiff Leaked Information About MDHI to Reporters. ....................23

      5.   Plaintiff Made Racially Discriminatory and Insensitive Comments That Independently Justify His Termination. ..........................24

   B.   Plaintiff Cannot Receive Back Pay After the Date He Disclosed or Should Have Disclosed Evidence of His Wrongdoing. .....................................25

IV.  MDHI Is Entitled to Summary Judgment as to Liability on Counterclaims 1, 7, 8. ...26

   A.   The Undisputed Record Demonstrates Plaintiff Repeatedly Breached His Confidentiality Agreement (Counterclaim 1).........................................26

   B.   Plaintiff's Solicitation of MDHI's Information from Rupp and Erickson Breached Arizona's Statutory and Common Law (Counterclaims 2 & 7)........30

V.   Ruth Marsteller Is Not a Proper Plaintiff.................................................................32

CONCLUSION...................................................................................................................33

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743 (E.D. Va. 2016) ...................................17

*Brazill v. Cal. Northstate College of Pharmacy, LLC*, 949 F. Supp. 2d 1011 (E.D. Cal. 2013)...................................................................................................................................12

*Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015 (D. Ariz. 2014) .........................................30

*Cheeks v. Gen. Dynamics C4 Sys. Inc.*, 684 F. App'x 658 (9th Cir. 2017) ..........................29

*Elkharwily v. Mayo Holding Co.*, 84 F. Supp. 3d 917 (D. Minn. 2015) ...............................14

*Food Servs. of Am., Inc. v. Carrington*, No. CV-12-00175-PHX-GMS, 2013 WL 4507593 (D. Ariz. Aug. 23, 2013) ....................................................................................31

*George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014) .............................................................7, 8

*Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013) ........................15

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ...................................................15

*Manion v. Spectrum Healthcare Res.*, 966 F. Supp. 2d 561 (E.D.N.C. 2013) .....................16

*Mann v. Heckler & Koch Def. Inc.*, 630 F.3d 338 (4th Cir. 2010)..........................................9

*Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. 2013) ...........................................................................................................................10

*McKennon v. Nashville Banner Publ'g. Co.*, 513 U.S. 352 (1995) .......................................18

*Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir. 1999)...........................................19

*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999) ........................7

*Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838 (9th Cir. 2002) ...................8

*Moore v. Gilead Scis., Inc.*, No. C 07-03850 SI, 2012 WL 1192075 (N.D. Cal. Apr. 10, 2012) ...........................................................................................................................19

*Moore v. Univ. of Kansas*, 2015 WL 9239749 (D. Kan. Dec. 17, 2015) .............................16

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .........................13, 14

*Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938) ..............................................15

*Norwood v. Harrison*, 413 U.S. 455 (1973) ......................................................................7, 8

*O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996) ...............................19, 20, 25

*Parkhurst v. Trapp*, 77 F.3d 707 (3d Cir. 1996) .................................................................................8

*Reiter v. Cooper*, 507 U.S. 258 (1993) ...........................................................................................15

*Rivera v. NIBCO, Inc.*, 364 F.3d 1057 (9th Cir. 2004) .....................................................................18

*Sellers v. Mineta*, 358 F.3d 1058 (8th Cir. 2004) ...........................................................................19

*Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243 (W.D. Wash. 2011) ....................................................8, 9

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011) .............................................................................................................6, 27, 28

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. CV06-1381PHXNVW, 2009 WL 1457036 (D. Ariz. May 21, 2009)...........................................passim

*United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610 (E.D. Va. 2016).....................17

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996)..........................................6, 9, 12

*United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973 (N.D. Ill. 2015).......................14

*United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540 (E.D. Pa. 2014).............................9

*United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628 (7th Cir. 2016) .................................................10

*United States ex rel. West v. Timex Corp.*, 361 F. App'x 249 (2d Cir. 2010) .........................................9

*United States v. Reed*, 15 F.3d 928 (9th Cir. 1994) ..........................................................................7

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007)....................................................................7

*University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2525 (2013) ...................13

*Wichansky v. Zowine*, 150 F. Supp. 3d 1055 (D. Ariz. 2015) ............................................................31

*Yeary v. Fla. Dep't of Corr.*, No. 95-0583-CIV-J-21-C, 1997 WL 284648 (M.D. Fla. May 13, 1997) ................................................................................................................25

**STATE CASES**

*Covid, Inc. v. Misencik*, No. 1 CA-CV 12-0666, 2014 WL 1056794, at *5 (Ariz. Ct. App. Mar. 18, 2014)..............................................................................................................31

*Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180 (2014) ........................................................30

# OTHER AUTHORITIES

5 U.S.C. 1221(e) ........................................................................................................ 18

10 U.S.C. § 2409 ................................................................................................... passim

31 U.S.C. § 3730(h) ............................................................................................... passim

41 U.S.C. § 2104 ................................................................................................ 10, 12

41 U.S.C. § 4712 ........................................................................................................ 16

48 C.F.R. 203.905(2) (2009) ..................................................................................... 15

Fed. R. Civ. P. 26(a)(1)(A)(ii) ................................................................................... 25

Fed. R. Civ. P. 56 ........................................................................................................ 1

Federal Acquisition Regulation §§ 1.601-1.604 ...................................................... 11

Federal Acquisition Regulation §§ 232.501-232.503 .............................................. 11

Ariz. Rev. Stat. § 25-215 ........................................................................................... 32

Ariz. Rev. Stat. §§ 44-401 ................................................................................... 30, 31

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant MD Helicopters, Inc. ("MDHI") hereby moves for summary judgment against Plaintiffs Philip and Ruth Marsteller as to their claims, and in favor of MDHI as to liability on its Counterclaims 1, 2, and 7, for the reasons set forth in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Philip Marsteller was, by all accounts—including his own—an unabashedly awful employee. He habitually ignored established rules and procedures, criticized his co-workers behind their backs, deliberately fomented workplace disputes, and failed to adequately perform the one thing that he was hired to do: sell helicopters. He was also, as discovery has revealed, a saboteur who secretly and actively worked to undermine MDHI in a calculated scheme to force a fire sale of the company—to himself. In connection with this plan, Plaintiff became a *de facto* agent who conducted unauthorized and unconstitutional investigative activities on behalf of a rogue Department of Defense, Office of Inspector General ("DODIG") investigator who acted without a warrant or appropriate authorization in his effort to expand the reach of his approved investigations of a former Army officer's interactions with an Eastern European company. Plaintiff was even advised by this DODIG investigator to file a civil *qui tam* lawsuit to support the agent's unauthorized efforts. Plaintiff continued his illegal activities until the DODIG investigator with whom he was working was removed and directed to have no further contact with Plaintiff. Ultimately, Plaintiff's vague and unsubstantiated *qui tam* allegations were simply one more effort to destroy MDHI from within. His allegations were so fundamentally baseless that they were dismissed at the Rule 12 stage and cannot support a reasonable belief—whether measured subjectively or objectively—that MDHI was engaged in fraud on the government.

The retaliation claims that Plaintiff advances here are likewise baseless. Plaintiff's conduct—even if it could be considered "protected" under the False Claims Act ("FCA") despite its unlawful character—was not the reason for his termination. Instead, the undisputed facts demonstrate both that at the time that she made the decision to terminate his employment, the

relevant decision maker had no knowledge of Plaintiff's interactions with the government, his allegations, or his *qui tam* lawsuit (which remained under seal until September 2014, over a year after his termination), and also that she had a clear, non-retaliatory basis for Plaintiff's termination.

As a result, Plaintiff's FCA retaliation claim fails as a matter of law. Plaintiff's other retaliation claim, brought under 10 U.S.C. § 2409, fails for the same substantive reasons as his parallel § 3730(h) claim. Moreover, Plaintiff failed to exhaust his administrative remedies as required by this statute, thus barring his § 2409 claim in this forum. As a separate matter, even if the undisputed record did not foreclose Plaintiff's retaliation claims as it does, as an at-will employee the undisputed evidence of Plaintiff's misconduct limits his damages claims under the after-acquired evidence doctrine. That same evidence also demonstrates that Plaintiff's flagrant and repeated violation of his non-disclosure agreement, and his inducement of other employees to violate their own non-disclosure agreements, in violation of both the statutory and common law of Arizona, entitles MDHI to summary judgment as to liability on its Counterclaims 1, 2, and 7. Finally, only Philip Marsteller, not his wife and nominal co-plaintiff Ruth Marsteller, has standing to pursue any of the claims at issue here. For each of the foregoing reasons, MDHI is entitled to summary judgment.

## FACTUAL BACKGROUND

Plaintiff Philip Marsteller was hired by MD Helicopters, Inc. ("MDHI") to sell helicopters. DSOF ¶ 1. Plaintiff, however, had bigger plans. DSOF ¶¶ 73-79. He wanted to run the company. *Id.* But Plaintiff was not doing very well in his actual position as a helicopter salesman. DSOF ¶¶ 5-15. He sold few aircraft. DSOF ¶ 8. He ran up substantial international travel expenses. DSOF ¶¶ 8, 11. He had trouble following company rules and directions, including those set by MDHI Chief Executive Officer and Chairwoman of the Board Lynn Tilton. DSOF ¶¶ 14-15. And, he got along with few people in the company. DSOF ¶¶ 5-7. Plaintiff frequently created conflict and chaos in his personal and professional interactions. DSOF ¶¶ 5-7, 12-13. He often criticized and undermined his fellow employees behind their backs. *Id.* Tilton was

unimpressed with Plaintiff's performance, and Plaintiff knew that he could be terminated at any time.  DSOF ¶¶ 1, 8-9, 14, 86.

Against this backdrop, Plaintiff developed a scheme to drive down the value of the company in the hopes of displacing Tilton as controlling owner, CEO, and Chairwoman of MDHI.  DSOF ¶¶ 73-79.  In pursuit of this objective, in early 2013 Plaintiff contacted Special Agent Lance Stamper ("Agent Stamper") from the DODIG.  DSOF ¶ 16.  Plaintiff (incorrectly) alleged to Agent Stamper that it was a crime for a former Army officer, Colonel Norbert Vergez, to be hired by an affiliate of MDHI called Patriarch Partners Management Group, LLC ("PPMG"), that MDHI was violating the FCA by offering to sell helicopters to the government at "base prices" that were not the lowest prices at which the helicopters had been sold previously, and that Tilton had purportedly bribed Vergez while he was in the Army.  *Id.*  None of these allegations were true, nor were they subjectively or objectively reasonable.  DSOF ¶¶ 16-26.  In Agent Stamper, however, Plaintiff found a willing, if perhaps unwitting, participant in his plan.  Unbeknownst to anyone at MDHI, Agent Stamper already was investigating Colonel Vergez in connection with a two-year old investigation called "Avia Baltika."  DSOF ¶¶ 27-31.  As part of the Avia Baltika investigation, Agent Stamper was investigating potential conflicts of interest between Vergez and Avia Baltika, an Eastern European company.  *Id.*  That investigation related to Vergez's service while on active duty in the Army and had nothing to do with MDHI, Tilton, or any of Tilton's other companies such as Patriarch Partners, LLC or PPMG.[1]  DSOF ¶¶ 32-34.  After meeting with Plaintiff, Agent Stamper opened another investigation, called "Colonel Norbert Vergez," which Agent Stamper "spun off" from the Avia Baltika investigation (collectively, the "DODIG Investigations").  DSOF ¶ 29.  MDHI, Tilton, and Patriarch were not formal subjects of the DODIG Investigations, and Agent Stamper never opened named investigations into any of them.  DSOF ¶¶ 33-34.

In his zeal to investigate Vergez, however, Agent Stamper drank some of Plaintiff's Kool-Aid.  Soon after meeting with Plaintiff, and without formally opening named investigations,

---

[1] PPMG and Patriarch Partners, LLC are separate companies.  However, for ease of reference only, they are referred to in this motion jointly as "Patriarch" or "the Patriarch entities."

Agent Stamper did begin to try to expand the scope of the DODIG Investigations, employing Plaintiff in his attempts to do so. DSOF ¶¶ 35-65. At Agent Stamper's request and direction, and with his acquiescence, Plaintiff engaged in numerous investigative activities on Agent Stamper's behalf. *Id.* Agent Stamper even advised Plaintiff to file a civil *qui tam* suit to assist with Agent Stamper's rogue activities. DSOF ¶¶ 50-54. In furtherance of Agent Stamper's instructions and requests, Plaintiff searched MDHI's premises, seized materials from them, and provided the results of his search and seizure to Agent Stamper. DSOF ¶¶ 35-50, 58-60. Agent Stamper, however, never had a search warrant for these activities. DSOF ¶¶ 59, 66. To the contrary, Agent Stamper used Plaintiff in an attempt to build what Agent Stamper believed would be a case for a warrant. DSOF ¶ 58. But when Agent Stamper presented his requests for a warrant to federal prosecutors, his requests were denied—not once, but twice. DSOF ¶ 59. Even after his requests were rejected, Agent Stamper continued to improperly encourage and employ Plaintiff to illegally obtain documents and information from MDHI. DSOF ¶ 60. Ultimately, Agent Stamper was removed from the DODIG Investigations—the first time in his lengthy career that he has been removed from an investigation—and directed to have no further contact with Plaintiff. DSOF ¶ 67.

Though costly and damaging to the company, Plaintiff's efforts ultimately were unsuccessful. The company was never the target of any criminal investigation or charged with any crime. DSOF ¶¶ 33-34, 69. Moreover, the United States declined to intervene in Plaintiff's *qui tam* lawsuit, and a federal district court dismissed it at the pleadings stage. DSOF ¶¶ 71-72. And, the U.S. government continues to award contracts to MDHI, including as recently as last week, when it awarded MDHI a contract, potentially worth more than one billion dollars, to provide as many as 150 helicopters. DSOF ¶ 70.

While Plaintiff worked to undermine MDHI through Agent Stamper, he also continued his (ultimately unsuccessful) efforts to harm and thereby devalue the company in other ways. DSOF ¶¶ 101-118. To do so, in violation of his confidentiality agreement and duty of loyalty to the company, Plaintiff leaked confidential information about MDHI, Patriarch, and Tilton to reporters, forwarded it to non-governmental third parties, and took voluminous materials

belonging to MDHI, including by inducing then-current MDHI employees to violate their own obligations to the company by agreeing to Plaintiff's requests. *Id.* MDHI also has learned through Plaintiff's discovery production that while secretly recording his colleagues at MDHI, Plaintiff unwittingly recorded himself expressing racist, derogatory comments and generalizations about persons based on their race. DSOF ¶ 6. Had Tilton known of any one of these actions at the time, she would have directed that Plaintiff's employment be terminated. DSOF ¶¶ 100, 125.

Ultimately, Plaintiff's duplicity and penchant for fomenting disruption within MDHI caught up with him. In early August 2013, Plaintiff overheard two MDHI management officials discussing interviewing a potential replacement Chief Financial Officer for the company. DSOF ¶ 80. After overhearing this sensitive personnel information, Plaintiff improperly told others in the company—including the then-CFO, who later resigned before the company had identified a replacement. DSOF ¶¶ 80-82, 89. Upon learning of this incident, Tilton was furious and directed that Plaintiff's employment be terminated. DSOF ¶ 87. Plaintiff was informed of this decision, and the non-discriminatory reasons for his termination, on August 23, 2013. DSOF ¶ 98. This is memorialized in a surreptitious recording that Plaintiff had made of his termination, which MDHI learned of through discovery in this action. DSOF ¶ 119.

On the same day that Plaintiff's employment was terminated, MDHI received a letter from the Civil Division of the Department of Justice ("DOJ") asking MDHI to preserve certain documents. DSOF ¶ 95. That letter made no mention of Plaintiff whatsoever, a company whistleblower generally, or a *qui tam* lawsuit. DSOF ¶ 96. Plaintiff nevertheless asserts that that preservation letter was the cause of his termination. The undisputed facts, however, establish that Tilton believed that a competitor, against whom MDHI recently had won a significant arbitration, was behind the DOJ preservation letter. DSOF ¶ 97. Moreover, none of Plaintiff's illicit activities with DODIG, or his still-sealed *qui tam* lawsuit, were known to Tilton at the time she made the decision to terminate Plaintiff. DSOF ¶ 97.

**ARGUMENT**

**I.    Plaintiff's FCA Retaliation Claim (Count 1) Fails as a Matter of Law.**

To succeed on his retaliation claim, Plaintiff must establish (1) that he was engaged in conduct protected under the FCA; (2) that MDHI knew he was engaged in such conduct; and (3) that he was fired by MDHI because of that conduct. *United States ex rel. Cafasso v. Gen. Dynamics C4 Systems, Inc.*, No. CV06-1381PHXNVW, 2009 WL 1457036, at *11 (D. Ariz. May 21, 2009); *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). The record demonstrates Plaintiff's retaliation claim fails to satisfy any of these requirements, thus barring his claim as a matter of law.

**A.    Plaintiff Was Not Engaged in Conduct Protected Under the FCA.**

**1.    Plaintiff's Conduct Was Unlawful.**

With respect to the first element of Plaintiff's retaliation claim, because the conduct Plaintiff relies upon to claim he was engaged in protected activity—searching for and collecting information and documents on behalf of Agent Lance Stamper—was itself warrantless and unlawful, it falls outside the plain language of the FCA.

This case is very different from the typical FCA case in which a *qui tam* relator unilaterally selects and takes materials within his purview from a company, and then <u>later</u> provides those materials to someone in the government. In those circumstances, the government may be an <u>indirect</u> beneficiary of the relator's activities, and the relator's conduct might be protected, so long as the materials taken were reasonably related to the relator's *qui tam* action, the relator did not exceed his authority or commit an unauthorized trespass in taking the documents, and the relator's *qui tam* theory is objectively and subjectively reasonable. *See, e.g.*, *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011).

This case, however, raises a very different circumstance. Here, the government was not merely a passive recipient of materials previously collected by a relator on his own initiative. Instead, Plaintiff affirmatively and contemporaneously sought out and collected materials and engaged in other investigative activities in response to specific requests, directions, and instructions of a government agent. When a private party acts at the direction or with the

encouragement or acquiescence of the state, the private party becomes a *de facto* agent of the state. *See, e.g.*, *George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014) (concluding that private action may be attributed to the state "when the State provides significant encouragement, either overt or covert") (internal quotation marks omitted). In those circumstances, the same rules that apply to the activities of the agent also limit the *de facto* agent. *See, e.g., id.* (concluding both government agents and *de facto* agent could be held liable for Fourth Amendment violation). Thus, "officers may not avoid the requirements of the Fourth Amendment by inducing, coercing, promoting, or encouraging private parties to perform searches they would not otherwise perform." *Id.* (*citing United States v. Reed*, 15 F.3d 928, 932-33 (9th Cir. 1994); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999)).

There is no dispute that Plaintiff asserts that he was working with Agent Stamper in his capacity as a criminal investigator. DSOF ¶ 52. As Plaintiff admits, at the request and with the knowledge of Agent Stamper, Plaintiff engaged in the taking of company property, surreptitiously recorded private conversations, and surveilled private property of both MDHI and private individuals connected with the company. DSOF ¶¶ 35-51, 56-65. Indeed, according to Plaintiff, even the quintessential "protected activity" of filing a *qui tam* action was done at the specific direction of Agent Stamper because Agent Stamper believed that it would assist with his DODIG Investigations. DSOF ¶¶ 52-54. For his part, Agent Stamper acknowledges that he had a working relationship with Plaintiff, communicated frequently with him, and requested specific things from him. DSOF ¶ 35. For these reasons, Plaintiff acted as a *de facto* agent of Agent Stamper. *United States v. Ziegler*, 474 F.3d 1184, 1190 (9th Cir. 2007).

As Agent Stamper conceded, a government investigator's activities are limited by the U.S. Constitution. Ex. 10 (Stamper Dep.) at 338:22-340:25; *see also* DSOF ¶ 45. Indeed, it is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (internal quotation marks omitted). Agent Stamper, however, never obtained a search warrant for any of his and Plaintiff's investigative activities at MDHI, including for the information and documents searched for and seized by Plaintiff. DSOF ¶¶ 59, 66. To the contrary, Agent

Stamper's requests for a warrant for the precise categories of documents improperly seized by Plaintiff were repeatedly rejected, by a series of prosecutors, as lacking sufficient foundation even to present to a neutral magistrate. *Id.* After his requests for a warrant were rejected, Agent Stamper ultimately was removed from the DODIG Investigations and barred from further contact with Plaintiff. DSOF ¶ 67.

Unconstitutional searches and seizures are *per se* unlawful. Agent Stamper could not employ *de facto* Agent Marsteller to do that which Agent Stamper was, himself, not permitted to do. As a *de facto* agent, Plaintiff was no more authorized or permitted to engage in the wholesale search and collection of corporate records than Agent Stamper was, and his indiscriminate seizure of such materials for conveyance outside the company constitutes unlawful activity. *See, e.g.,* *George*, 752 F.3d at 1220; *Parkhurst v. Trapp*, 77 F.3d 707, 712 (3d Cir. 1996). Section 3730(h), however, expressly limits protected activity to "<u>lawful</u> acts" by the employee. 31 U.S.C. § 3730(h) (emphasis added). The undisputed facts here establish that Agent Stamper and Plaintiff engaged in unlawful searches and seizures. Such unlawful conduct cannot be lawfully protected activity under the FCA.

### 2. Plaintiff's Allegations Were Not Reasonable.

The first element of Plaintiff's FCA retaliation claim fails for an additional reason: to be engaged in protected conduct, a plaintiff must reasonably believe that his employer has submitted a false claim to the government. This test contains both a subjective and an objective component:

> (1) whether the employee in good faith believed that fraud was taking place and (2) whether "a reasonable employee in the same or similar circumstances might believe, that the employer [was] possibly committing fraud against the government."

*Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243, 1249 (W.D. Wash. 2011) (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845-46 (9th Cir. 2002)).

The record undermines Plaintiff's ability to make even the necessary subjective showing, as it is clear that Plaintiff's complaints were motivated principally—if not solely—by a desire to undermine MDHI in order to force a sale of the company to him. DSOF ¶¶ 73-79. Indeed,

Plaintiff's own testimony demonstrates that he was not only preparing for this eventuality (by soliciting investors), but also pushing to bring it about (by leaking confidential information to the press, and by participating in and encouraging what he hoped would become a criminal investigation of MDHI). *Id.*

In any event, even if Plaintiff could show a subjective good faith belief that he was investigating government fraud, despite his bad faith actions, his claims utterly fail to satisfy the objective prong of the test. "[A] core element of any FCA action is that there be an actual or potential false claim made against the U.S. Government." *Sicilia*, 775 F. Supp. 2d at 1250. As the Ninth Circuit has made clear,

> Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false <u>certification</u> of compliance which creates liability <u>when certification is a prerequisite to obtaining a government benefit</u>.

*Hopper*, 91 F.3d at 1266 (second emphasis added); *see also Mann v. Heckler & Koch Def. Inc.*, 630 F.3d 338, 346 (4th Cir. 2010) ("But the FCA is not concerned with bidding regulations: 'Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct.'" (quoting *Hopper*, 91 F.3d at 1269)). Without the requisite "nexus to the FCA," a plaintiff's belief that fraud has occurred is not objectively reasonable. 91 F.3d at 1269.

The three allegations Plaintiff raised when he met with Agent Stamper fail this fundamental test. DSOF ¶¶ 16-26. Plaintiff contended that MDHI offered to sell its helicopters to the government at "base" prices that were higher than prices MDHI had offered to other customers at different times for other helicopters. DSOF ¶ 16. But contrary to Plaintiff's mistaken assertions, the government is *not* always entitled to the lowest price. *See, e.g., United States ex rel. West v. Timex Corp.*, 361 F. App'x 249, 251 (2d Cir. 2010); *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 562 (E.D. Pa. 2014). Where the government wants to ensure it receives a contractor's lowest price for a good or service, it may include a "Most Favored Customer" or price-reduction clause in its contracts. But Plaintiff never reviewed the actual

helicopter sales contracts at issue, as not one of them contained such a requirement.[2] DSOF ¶¶ 17-18. The objective component of the test is not satisfied where a plaintiff bases his fraud claim only on second-hand information, and not the contracts themselves. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016). Indeed, Plaintiff's own *qui tam* complaint implicitly acknowledged this, as he attempted to rely on the Truth in Negotiations Act ("TINA"), rather than the contracts themselves, in support of his claim. *See Qui Tam* Action, Dkt. 1. But the TINA does not require the lowest price for every contract, and it acknowledges that pricing need only be commercially reasonable. *See id.*, Dkt. 1 at 4 (quoting relevant statutory provisions). Moreover, as the district court found in dismissing Plaintiff's *qui tam* complaint, compliance with the TINA is not a material requirement for payment of any claim under the contracts at issue, thus precluding an FCA action on this ground. *See id.*, Dkt. 77 at 16-18.

Plaintiff's remaining allegations likewise lack the necessary nexus to the FCA. With regard to the hiring of Vergez by PPMG, Plaintiff's purported belief that such an action was improper rested solely on his mistaken assertions as to the requirements of the law—assertions he persisted in advancing despite knowing that Vergez had an ethics opinion that permitted employment and that the Army was fully aware of the employment. DSOF ¶¶ 19-23. Indeed, even a cursory review of the relevant statute (cited in Plaintiff's own *qui tam* complaint, *Qui Tam* Action Dkt. 1 at 6-7) would have revealed the lack of any violation, as Vergez was neither employed by, nor compensated for his employment by, MDHI.[3] DSOF ¶ 20. More critically, even if Vergez's

---

[2] The procedural history of Plaintiff's *qui tam* demonstrates the unreasonableness of his allegations. When MDHI moved to dismiss Plaintiff's *qui tam* complaint on these grounds in the Northern District of Alabama, Plaintiff voluntarily abandoned his "lowest price" theory, dismissed his complaint, and filed an amended complaint raising new theories. *See Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. 2013) ("*Qui Tam* Action"), Dkt. 1(Complaint), Dkt. 47 (Defendant's Motion to Dismiss), and Dkt. 57 (Plaintiffs' First Amended Complaint). Plaintiff's First Amended Complaint then also was dismissed by the District Court. *See id.*, Dkt. 61 (First Amended Complaint), Dkt. 77 (Memorandum Opinion), and Dkt. 78 (Order Granting Motion to Dismiss).

[3] Notably, this statute, 41 U.S.C. § 2104, which Agent Stamper along with *de facto* Agent Marsteller considered to be a predicate for their criminal investigative activities, is only a *civil* statute and does not authorize criminal penalties. At his deposition, Agent Stamper acknowledged that even still today, he did not know one way or the other whether a violation of this statute would be a

employment had been a violation of the applicable statute and regulation, Plaintiff has never identified how that employment could have led to a false claim against the government. Indeed, the sole alleged monetary impact Plaintiff identifies as a result of Vergez's hiring is that, before he was hired by PPMG, Vergez approved progress payments to MDHI in connection with two contracts. Ex. 123 at 22-23. But a payment of the same amount of money actually owed to MDHI—even if paid on a different schedule than it otherwise would be—is patently not a "false" claim within the meaning of the FCA. Moreover, the Federal Acquisition Regulations specifically authorize such payments. Federal Acquisition Regulation §§ 232.501-232.503. Simply put, no reasonable employee in Plaintiff's situation could conclude that a false claim was occurring.

The same is true with regard to the relocation allowance paid to Vergez by PPMG. Plaintiff unwittingly recorded himself acknowledging that the allowance payment was not a bribe, only that he was concerned that it might have the <u>appearance</u> of one to someone who did not know all of the facts. DSOF ¶ 26. As Agent Stamper acknowledged, relocation payments are routinely made to relocating former government officials and are not illegal. DSOF ¶ 25. Moreover, Plaintiff has never identified how this alleged "bribe" resulted, or could have resulted, in a false claim on the government fisc. Vergez was not a contracting officer and thus had no authority to award contracts. DSOF ¶ 19; *see also* Federal Acquisition Regulation §§ 1.601-1.604. Here, where the supposed "bribe" was paid at the end of Vergez's tenure with the Army in conjunction with post-government employment, there is simply no objectively reasonable basis to believe that a fraudulent claim was (or even could have been) made. The lack of objective reasonableness in Plaintiff's purported position is further confirmed by the actual facts: while Vergez ultimately was charged with certain offenses (not raised by Plaintiff in his allegations to Agent Stamper), Vergez was never charged with a bribery offense. DSOF ¶ 68. It also is undisputed that neither MDHI, nor the Patriarch entities, nor Tilton were ever charged with any criminal offense. DSOF ¶ 69. This includes the purported "crimes" alleged by Plaintiff to Agent

---

crime. Ex. 9 (Stamper Dep.) at 316:4-317:14; 319:24-320:24. Such willful ignorance underscores the lack of objective reasonableness in Agent Stamper's and Plaintiff's actions.

Stamper, namely criminal false claims; a violation of 41 U.S.C. § 2104, which is the <u>civil</u> compensation ban statute that formed the basis for Plaintiff's "hiring" allegation; or bribery. *Id.*

## B. Even If Plaintiff's Conduct Were Protected, the Sole Decisionmaker Had No Knowledge of It at the Time of His Termination.

Plaintiff's retaliation claim founders on a further statutory shoal: the second element, which requires that the adverse action be the result of the protected activity. It is axiomatic that "unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." *Hopper*, 91 F.3d at 1269; *see also Cafasso*, 2009 WL 1457036, at *12 ("It is undisputed Marzilli alone made the decision to eliminate the CTO, which included Cafasso's position, and when Marzilli decided to eliminate the CTO, he did not know of Cafasso's concerns about compliance with the TTRB policy or federal regulations."). Here, it is undisputed that Tilton alone made the decision to terminate Plaintiff. DSOF ¶ 93. And it also is undisputed that neither Plaintiff himself, nor anyone else, had informed Tilton of Plaintiff's allegations at the time she made that decision. DSOF ¶ 94.

Moreover, that Plaintiff's employment was terminated near in time to the company's receipt of a document preservation letter from DOJ is not enough for his claim to survive summary judgment. "<u>[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.</u>" *Brazill v. Cal. Northstate College of Pharmacy, LLC*, 949 F. Supp. 2d 1011, 1024 (E.D. Cal. 2013) (collecting cases) (emphasis added). The DOJ preservation letter requested only that the company preserve certain documents in connection with a DOJ civil investigation. DSOF ¶ 95. It is undisputed that the preservation letter does not mention Plaintiff, nor claim to be based on an alleged whistleblower complaint generally, nor even reference a *qui tam* lawsuit. DSOF ¶ 96. MDHI had won a hard-fought and contentious arbitration involving Boeing shortly before the letter was received. DSOF ¶ 97. Rather than associate Plaintiff with the letter, Tilton believed that Boeing, or another competitor called DTI, was behind it. DSOF ¶ 97. Other witnesses have confirmed Tilton's understanding and shared her belief. *Id.* Accordingly, because Tilton was not aware of Plaintiff's allegations of

fraud at the time that she made the decision to terminate his employment, that decision could not, as a matter of law, have been a violation of § 3730(h).

### C. Even If Plaintiff Could Establish a Retaliatory Motive for His Termination, His Claim Would Still Fail for Lack of But-For Causation.

A final statutory requirement precludes Plaintiff's retaliation claim here: the element of but-for causation. In a series of cases, the Supreme Court has held that retaliation statutes that require a plaintiff to show retaliation "because of" protected conduct—as the FCA does—require proof of but-for causation. Where a non-retaliatory motive for the termination exists, even if it is accompanied by a forthrightly retaliatory one, the necessary causation is absent and the retaliation claim fails.

As the Supreme Court most recently explained in *University of Texas Southwestern Medical Center v. Nassar*, it is "textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" 133 S. Ct. 2517, 2525 (2013) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on The Law of Torts* 265 (5th ed. 1984)). Because Congress legislates against the backdrop of the common law, "it is presumed to have incorporated" such "default rules" in the absence of any statutory indication to the contrary. *Id.* at 2525. The ordinary meaning of "'because of'"—"'by reason of' or 'on account of'"— compels the conclusion that the use of such language in a statute requires proof of but-for causation. *Id.* at 2527 (citing cases). The but-for test, as the Court observed, "requires proof that the unlawful retaliation <u>would not have occurred</u> in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533 (emphasis added).

As a result, even where protected conduct played a role in the employer's decision, if the employer would have terminated the employee anyway for a non-retaliatory reason, the employee's claim fails for lack of causation. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977). In *Mt. Healthy*, a First Amendment case, the Supreme Court explained the rationale for its rule as ensuring the employee was placed in neither a better nor a worse position by his protected conduct:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of

the exercise of constitutionally protected conduct than he would have occupied had he done nothing. . . . The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 285-86.

Because § 3730(h) requires the retaliation to have been taken "because of" the employee's protected conduct, it requires proof of but-for causation. 31 U.S.C. § 3730(h)(1). In applying this but-for test, courts reject FCA retaliation claims where a retaliatory motive, even if present, is not the sole cause of the complained-of action. *See, e.g.*, *United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973, 985 (N.D. Ill. 2015) (granting summary judgment on FCA retaliation case under but-for causation standard); *Elkharwily v. Mayo Holding Co.*, 84 F. Supp. 3d 917, 927 (D. Minn. 2015) ("Even crediting [the] theory that whistle-blowing played a role in his termination, it plainly was not the sole basis for [the employer's] decision. As a result, there is no causal connection between Elkharwily's reports of fraud and his termination.").

Here, the undisputed record demonstrates that Tilton made the decision to terminate Plaintiff <u>before</u> MDHI's receipt of the preservation letter from DOJ. DSOF ¶¶ 93-95. But even crediting Plaintiff's bare allegation that Tilton immediately connected the preservation letter to him—a claim unsupported by the letter itself, which makes no mention of Plaintiff, or the testimony of any of the executives involved, DSOF ¶ 97—Plaintiff's claim would still fail as a matter of law, as his ongoing employment failures and egregious disclosure of confidential information regarding MDHI's interview of a potential replacement for its then-CFO constituted an independent basis for his termination that precludes the necessary finding of but-for causation. DSOF ¶¶ 5-15, 93, 98.

## II.   Plaintiff's § 2409 Claim (Count 2) Fails as a Matter of Law.

Prior to bringing a reprisal claim in federal court under the Defense Contractor Whistleblower Protection Act ("DCWPA"), a plaintiff must exhaust all administrative remedies

- 14 -

with the relevant agency—here, the DODIG.  10 U.S.C. § 2409(c)(2).  The record demonstrates that Plaintiff failed to meet this threshold requirement—a failure that bars his claim in this court.  Moreover, even if Plaintiff could seek recovery under § 2409 in this forum, his claim would fail for the same lack of knowledge and causation fatal to his parallel retaliation claim under § 3730(h).

### A. Plaintiff Failed To Exhaust His Administrative Remedies, As Required To Bring a § 2409 Claim in Federal Court.

It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938); *see also Reiter v. Cooper*, 507 U.S. 258, 269 (1993) (When "relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts."). The exhaustion doctrine serves "'to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process.'" *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013) (quoting *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010)).  Section 2409 follows this settled rule, such that exhaustion of administrative remedies is a necessary precondition to a court adjudicating any claim brought under the statute.  10 U.S.C. § 2409(c)(2).

Section 2409 and its implementing regulations detail the steps necessary before a complainant will be deemed to have exhausted administrative remedies.  10 U.S.C. § 2409(b); 48 C.F.R. 203.905(2) (2009).  First, the complainant must submit a complaint, and the DODIG is required to undertake an investigation "[u]nless the Inspector General determines that the complaint is frivolous."  10 U.S.C. § 2409(b).  If the DODIG determines that a complaint merits further investigation, it must notify the complainant, the contractor alleged to have committed the violation, and the head of the agency, before it proceeds with the investigation.  48 C.F.R. 203.905(2).  After the DODIG completes its investigation, it must "submit a report of the findings of the investigation to the person, the contractor concerned, and the head of the agency."  10 U.S.C. § 2409(b).  Within thirty days of receiving the DODIG's report, the head of the agency must determine "whether there is [a] sufficient basis" to conclude that the complainant was

subjected to a prohibited reprisal; after this determination, the agency head must either issue an order denying relief to the employee or requiring the employer to take certain specified actions. 10 U.S.C. § 2409(c)(1).

Pursuant to § 2409(c)(2), administrative remedies are deemed exhausted in only two situations: (a) "[i]f the head of an executive agency issues an order denying relief" under § 2409(c)(1), or (b) if the head of an executive agency has not issued an order within 210 days after the submission of the complaint to the DODIG. *Id.* Only then will a plaintiff "be deemed to have exhausted all administrative remedies with respect to the complaint" and able to "bring a de novo action at law or equity against the contractor." *Id.* In analyzing § 2409 and other statutes with identical exhaustion language, courts have found that a suit lies only when the complainant has exhausted his administrative remedies. S*ee Manion v. Spectrum Healthcare Res.*, 966 F. Supp. 2d 561, 566 (E.D.N.C. 2013) (finding that the court has jurisdiction because the plaintiff exhausted his administrative remedies pursuant to § 2409); *see also Moore v. Univ. of Kansas*, 2015 WL 9239749, at *3-4 (D. Kan. Dec. 17, 2015) (confirming that identical language in 41 U.S.C. § 4712 established exhaustion as a threshold limitation on jurisdiction).

As the record reveals, Plaintiff filed two separate complaints at different times with the DODIG, but he exhausted neither. Plaintiff filed his first complaint with the DODIG "[o]n or about September 25, 2013." Dkt. No. 141 ¶ 104; *see also* DSOF ¶ 126. But upon review, the DODIG declined to open an investigation and dismissed his complaint, citing, *inter alia*, his sealed *qui tam* action. DSOF ¶ 128. In declining to investigate, the DODIG instead suggested to Plaintiff that he could pursue a suit under § 3730(h), but did not similarly suggest that he would be entitled to pursue a suit under § 2409. DSOF ¶ 129; *see also* Ex. 37. The DODIG's decision to defer to a pre-existing legal process is not one of the two statutorily enumerated events triggering a right to bring a civil suit under § 2409. Indeed, Plaintiff's own actions acknowledge that impediment to suit, as he did not then file an action under § 2409. Instead, after his *qui tam* complaint was unsealed, Plaintiff subsequently filed a separate, second DODIG complaint. DSOF ¶¶ 132-134. In response, the DODIG opened a new investigation with a new case number. DSOF ¶ 135. Moreover, the DODIG began an investigation in conjunction with that

new case. *Id.* Plaintiff, however, voluntarily withdrew his second DODIG complaint, so that he could add a § 2409 claim to his action in this Court. DSOF ¶ 136. At the time he withdrew, however, 210 days had not passed since Plaintiff had filed his operative complaint with DODIG. *Id.* That complaint was filed December 18, 2014, *id.*, and then withdrawn by Plaintiff on May 8, 2015—only 142 days later. *Id.* Because that withdrawal occurred less than 210 days after filing— the period mandated by the statute to permit the government to investigate the complaint— Plaintiff's subsequent addition of a § 2409 claim in this action is barred for lack of exhaustion.

**B.** **Plaintiff's § 2409 Claim Independently Fails Due to a Lack of Knowledge and Causation.**

Although there is a dearth of precedent interpreting § 2409, courts have acknowledged that precedent regarding § 3730(h) is instructive in understanding the similar anti-retaliation provision found in § 2409, which prohibits retaliation "as a reprisal for" a protected report. *See Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 751 (E.D. Va. 2016) (noting "that the FCA anti-retaliation provision, § 3730(h), provides an appropriate guide for interpreting the DCWPA's anti-reprisal provision, § 2409"). Accordingly, the same record evidence that dooms Plaintiff's § 3730(h) claim is likewise preclusive as to his § 2409 claim.

**Lack of Knowledge.** Like the parallel provision in the FCA, proof of a § 2409 claim requires the employee to show that the employer was aware of his protected activity at the time of the challenged action. *See, e.g.*, *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 620-21 (E.D. Va. 2016). Here, the undisputed record demonstrates that Tilton—the sole decision maker—had no knowledge of any putatively protected activity by Plaintiff at the time she decided to terminate his employment. DSOF ¶ 93-94. As detailed above, the record demonstrates that Tilton was not aware of any internal complaints by Plaintiff, much less a report to any outside agency, at the time that she made the decision to terminate his employment, a decision that was made before receipt of the DOJ preservation letter—which, again, did not mention Plaintiff or purport to be based on any whistleblower activity. DSOF ¶¶ 94-95; *see supra* Section I.B. As a result, Plaintiff cannot establish the knowledge necessary to prove his termination was a reprisal for any protected report.

**Lack of But-For Causation.** Just as with the FCA anti-retaliation provision, the DCWPA precludes recovery where but-for causation does not exist. 10 U.S.C. § 2409(c)(6). As the statute makes clear, a retaliation claim under § 2409 fails where there exists a legitimate, non-retaliatory reason for the employee's discharge. 10 U.S.C. § 2409(c)(6). Section 2409(c)(6) incorporates the evidentiary requirements set forth in 5 U.S.C. 1221(e). That statute prohibits "[c]orrective action" where the employer demonstrates it "would have taken the same personnel action in the absence of such disclosure." 5 U.S.C. 1221(e)(2). Thus, § 2409 applies the same but-for causation test applicable under the FCA's anti-retaliation provision. Because the record demonstrates a legitimate, non-retaliatory reason (indeed, a host of such reasons) to terminate Plaintiff's employment—and that those reasons led to the decision to terminate Plaintiff wholly apart from Plaintiff's allegedly protected activity, Plaintiff's § 2409 claim fails as a matter of law. DSOF ¶¶ 5-15, 87, 93; *see supra* Section I.C. Because these reasons were independently sufficient to support his termination, regardless of any alleged additional retaliatory animus, Plaintiff simply cannot demonstrate the necessary but-for causation.

### III. Even if Plaintiff's Retaliation Claims Were Not Defeated by the Undisputed Record, His Damages Claims Would Be Limited by the After-Acquired Evidence Doctrine.

The after-acquired evidence doctrine limits a plaintiff's recovery of damages for alleged retaliation where the employer subsequently discovers evidence that, had it been known at the time, would have supported termination. *See, e.g., McKennon v. Nashville Banner Publ'g. Co.*, 513 U.S. 352, 361 (1995). Here, although the record reveals ample basis for Plaintiff's termination at the time that decision was made, discovery has uncovered additional instances of Plaintiff's egregious and willful misconduct. DSOF ¶¶ 73-79, 101-118. Such additional misconduct began while he was an employee and continued even after his termination. *Id.* These circumstances sharply limit the recovery Plaintiff seeks (and outright bar his request for "reinstatement").

"The after-acquired evidence doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later discovers evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070–71 (9th Cir. 2004) (internal quotation marks omitted).

Where an employer proves by a "preponderance of the evidence" that it would have terminated the employee for the later-discovered misconduct, "the employer does not have to offer reinstatement or provide front pay, and only has to provide backpay from the date of the unlawful discharge to the date the new information was discovered." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759, 761 (9th Cir. 1996) (internal quotation marks omitted); *see also, e.g.*, *Moore v. Gilead Scis., Inc.*, No. C 07-03850 SI, 2012 WL 1192075, at *7-10 (N.D. Cal. Apr. 10, 2012) (granting partial summary judgment to employer on after-acquired evidence defense to claim of retaliatory termination under the FCA).[4]

## A. The After-Acquired Evidence Doctrine Applies Here.

Plaintiff's repeated and flagrant misconduct—which discovery has revealed was largely undertaken as part of an unsuccessful scheme to tank MDHI's value so that Plaintiff could make a play to purchase the company—includes (1) lining up investors and entering into a non-disclosure agreement with them in connection with his attempt to acquire ownership of MDHI; (2) providing MDHI's confidential documents and information to non-governmental third-parties; (3) surreptitiously recording internal meetings and conversations with MDHI employees; (4) disseminating damaging and untrue allegations and non-public information about MDHI to reporters; and (5) making racially discriminatory remarks captured on his surreptitious recordings. DSOF ¶¶ 6, 50, 73-79, 101-118. MDHI, like any employer, would have fired Plaintiff for these flagrant violations of his confidentiality agreement, conflicts of interest and pervasive attempts to undermine the company for his own gain, and general misconduct that was detrimental to the functioning of the company. DSOF ¶ 125. Accordingly, pursuant to the after-acquired evidence

---

[4] Two appellate courts to consider the issue have held that post-termination misconduct also may form the basis for an after-acquired evidence defense. *See Sellers v. Mineta*, 358 F.3d 1058, 1062 (8th Cir. 2004); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 555 (10th Cir. 1999). Through discovery MDHI has learned of extensive misconduct that Plaintiff engaged in while he was employed at MDHI. Any of this activity would have resulted in his termination had MDHI known it was occurring while he was employed. But Plaintiff also has continued to take actions adverse to the interests of the company since his termination, including by additional breaches of his confidentiality obligations and defaming MDHI and its officers in the press. Thus, while post-termination misconduct is not required for MDHI to prevail on its after-acquired evidence defense, the Court may consider it as additional grounds for the defense.

doctrine, Plaintiff cannot seek reinstatement or front pay, and any award of backpay should be limited to the period from August 23, 2013 (the date of his termination) to December 31, 2014 (when Plaintiff first revealed his misconduct, although not the full extent of it), or, at the latest, March 9, 2015 (when Plaintiff produced evidence of that misconduct). As detailed in the Declaration of Lynn Tilton ("Tilton Decl."), and supported by MDHI policy (Exs. 29, 30), Plaintiff's confidentiality agreement (Ex. 68), and common sense, MDHI would have terminated Plaintiff for any of his numerous instances of misconduct set forth below. *See* DSOF ¶ 125; *see also O'Day*, 79 F.3d at 762 (affirming grant of summary judgment on after-acquired evidence defense based on affidavit of employee familiar with termination decisions corroborated by company policy and "common sense"). These circumstances justify the application of the after-acquired evidence doctrine here.

### 1. Plaintiff Was Secretly Trying To Buy MDHI at a "Fire Sale" Price Driven by His Efforts to Undermine the Company.

No later than May 2013, while still employed at MDHI, Plaintiff secretly began planning to buy the company. DSOF ¶ 73. MDHI, however, was not for sale, and Tilton, who owns the controlling interest in MDHI and is its CEO and Chairwoman of the Board, Tilton Decl. ¶ 2, was not interested in selling it to Plaintiff.

Plaintiff admitted to reaching out to potential investors about teaming up to acquire MDHI as early as April or May 2013, while he was still employed at the company. DSOF ¶ 73. In May 2013, Plaintiff executed a non-disclosure agreement with John Stack, the head of an aerospace practice at a venture capital firm. *Id.*; *see also* Ex. 103 at PAM0052886. Plaintiff later told Stack he hoped that the investigation of MDHI for which he was agitating would cause "the bottom to fall out at MD so we can get a shot at doing something." Ex. 83.

Plaintiff also was engaged in discussions to purchase MDHI with Alex Crutchfield and Randy Pullen, the owners of another investment firm, during Plaintiff's employment at MDHI. Ex. 3 (Marsteller Dep.) at 299:2-14; Ex. 25; Ex. 98. In July 2013, Plaintiff emailed Pullen a confidential document containing MDHI's capital, sales, and shareholder information. Ex. 101. Consistent with his plan to drive down the value of the company, Plaintiff told Crutchfield and

Pullen that since, in Plaintiff's distorted worldview, "Lynn [Tilton] is embroiled in the criminal investigation [hoped for by Plaintiff] she may be trying to move the company before all of this becomes public. This would give us the opportunity to get things moving prior to this and place us in a better position to negotiate." Ex. 98. After MDHI received the document preservation letter from the Civil Division of the DOJ, Plaintiff wrote Crutchfield that he "would like to discuss the <u>next move</u> with MD" and that he "want[s] to be ready to move when the time is right." Ex. 99 (emphasis added). Even after his termination, Plaintiff continued to look for a business partner to make a bid for MDHI, and he has had such discussions at least as recently as 2016. Ex. 3 (Marsteller Dep.) at 311:2-312:8.

Plaintiff's undisclosed scheme here was particularly manipulative and egregious given that Tilton has a controlling ownership interest in MDHI. Tilton Decl. ¶ 2. No company would continue to employ an individual upon learning that he or she was secretly working, as an insider, to buy the company out from under its current ownership. Indeed, this would present a clear conflict of interest between an individual's duties to the company and his or her personal interests. Tilton Decl. ¶ 9(f). Moreover, although Plaintiff's motive is immaterial to the application of the after-acquired evidence doctrine, it also is now clear that while employed by the company Plaintiff engaged in a gross breach of his duties to MDHI, seeking to leverage the DODIG Investigations, as well as his own leaks to reporters, to advance his agenda by putting pressure on MDHI and, Plaintiff hoped, driving down its value to facilitate a sale to the group of investors he was working to assemble. DSOF ¶¶ 73-79. While Tilton and MDHI were unaware at the time of Plaintiff's employment that he was, at the same time, secretly trying to acquire the company—and trying to do so at a depressed price—they now are aware of that plan. MDHI would have terminated Plaintiff's employment had the company known about his plan at the time. DSOF ¶ 125.

> **2.    Plaintiff Revealed—and Continues to Reveal—MDHI's Confidential Information to Non-Governmental Third Parties.**

Both before and after his termination, Plaintiff disclosed MDHI's documents and information to additional third parties outside of the government in violation of his

confidentiality agreement. DSOF ¶¶ 110-114. For example, in June 2013, while still employed at MDHI, Plaintiff sent a compilation of documents containing MDHI's confidential financial statements and internal discussions concerning the company's proprietary pricing model and pricing decisions to a private citizen named Steve Bear. Ex. 79; Ex. 3 (Marsteller Dep.) at 236:12. Plaintiff also provided Bear with Tilton's detailed, minute-to-minute, travel itinerary for the June 2013 Paris Air Show <u>while Tilton was there</u>—a major security risk that compromised not only Tilton's personal safety, but MDHI's interest in the safety of its CEO and Chairwoman. *Id.* Plaintiff also violated federal law by providing Bear with a copy of his *qui tam* complaint <u>fifteen months before</u> it was unsealed. *Id.* Upon receiving some of these materials, Bear responded to Plaintiff that he "smell[ed] a story." Ex. 92. When confronted with these communications in his deposition, Plaintiff admitted that Bear was a private citizen and not a government employee, but he denied that Bear was a reporter. Instead, Plaintiff claimed, Bear was self-employed in "investigative-type work." Ex. 3 (Marsteller Dep.) at 236:7-12. Plaintiff then testified that he did not pay Bear to perform any investigative-type work, and instead claimed that he provided Bear with this confidential information about MDHI and Tilton's travel itinerary so that Bear, a purported former CIA operative, could supposedly apply "political pressure on the Hill" to "make sure that [Plaintiff's hoped-for] criminal investigation into MD went forward." Ex. 3 (Marsteller Dep.) at 238:5-8; 239:11-12. It did not.

Plaintiff also continued to disclose MDHI's confidential information to third parties after his termination, including to MDHI's potential competitors and the media. DSOF ¶¶ 114.

MDHI would have terminated Plaintiff's employment on this ground had the company known about these communications at the time. DSOF ¶ 125.

### 3. Plaintiff Surreptitiously Recorded MDHI Employees.

In response to MDHI's first discovery requests, Plaintiff produced nearly 70 recordings of internal MDHI business meetings and his conversations with MDHI employees, made without the knowledge or consent of MDHI or the employees being recorded. Ex. 123 at 2-5. Plaintiff testified that he generally attempted to record *all* of his conversations at MDHI over a period of several months, and he claims that he failed to capture certain discussions only because of his

technical "incompetence." Ex. 3 (Marsteller Dep.) at 74:6-12. These recordings thus were not targeted to discussions that could have supported his *qui tam* claims, and they included privileged discussions with MDHI inside and outside counsel. DSOF ¶ 122. MDHI was unaware of Plaintiff's activities, and it never consented to Plaintiff recording business conversations on its premises or between MDHI employees who were conducting business for the company. Such activities are invasive of privacy interests and disruptive to the company. Indeed, individual employees swept up in Plaintiff's covert recordings testified that they had no knowledge were being recorded and would have objected to such recordings had they known. Ex. 7 (Ruppert Dep.) at 208:16-209:12; Ex. 6 (Rupp Dep.) at 228:1-14. MDHI would have terminated Plaintiff's employment on this ground had MDHI known about this at the time. DSOF ¶ 125.

### 4. Plaintiff Leaked Information About MDHI to Reporters.

Plaintiff has admitted to speaking to numerous reporters about MDHI, including journalists from the Wall Street Journal and The Associated Press, and to providing them with confidential information about MDHI. Ex. 3 (Marsteller Dep.) at 231:13-233-24, 256:21-257:1. Plaintiff's unsuccessful campaign to bring down MDHI so he could acquire the company included leaks to reporters to disparage MDHI or put pressure on it in public. For example, before his termination, and just months after he filed his *qui tam* lawsuit, Plaintiff emailed his co-relator, Matt Swisher, to inform him that a "big exposé" on MDHI would be published imminently by Reuters. Ex. 82. Plaintiff admitted to Swisher that he had spoken to the reporter off the record in an attempt to "end this thing," and he asked Swisher if he would do the same. Ex. 76. When the article was published days later, Plaintiff described it as "[t]he first boulder in the avalanche that is going to smash Lynn Tilton." Ex. 90.

Since his termination, Plaintiff continued to communicate with reporters to publicly smear MDHI and advance his own agenda. DSOF ¶ 114. Plaintiff has no right to discuss MDHI's confidential business information with reporters even after his termination; such activities are prohibited by his confidentiality agreement and violate his duty of loyalty to the company. DSOF ¶ 108. MDHI would have terminated Plaintiff's employment on this ground had the company known about these communications at the time. DSOF ¶ 125. For example, Plaintiff admits

that he was the source for a March 20, 2014 Associated Press article that mischaracterized a DOJ investigation of Vergez and described numerous confidential MDHI documents known to have been misappropriated by Plaintiff, including internal emails and copies of MDHI agreements, and documents concerning Tilton's trip to the Paris Air Show, which as discussed above, Plaintiff leaked to Steve Bear prior to his termination. DSOF ¶¶ 114, 123; *see also* Exs. 81, 121. In an email to Agent Stamper, Plaintiff admitted that "the [AP] article was based on my actions without the knowledge of any of my attorneys." Ex. 81. Plaintiff added that "[i]f the US Gov attorneys have a problem with that then they need to deal with me." *Id.*

### 5. Plaintiff Made Racially Discriminatory and Insensitive Comments That Independently Justify His Termination.

Finally, discovery also has revealed that, in the course of indiscriminately and surreptitiously recording his conversations at MDHI, Plaintiff inadvertently recorded himself making flagrantly offensive and inappropriate racial comments. DSOF ¶ 6. In a recording that Plaintiff made on or around August 9, 2013, while Plaintiff was still employed by MDHI, Plaintiff unwittingly captured himself complaining about "the blacks in this country" and how they "expect everything handed to them…they expect everything on a silver platter." Ex. 126. Plaintiff also recounted a purported incident in which he was allegedly assaulted by "a little black fucker." *Id.* MDHI has an explicit policy of treating its employees equally based on race, and other characteristics, and it does not tolerate employees who engage in racially discriminatory acts, offensive language and ethnic jokes. Ex. 30. Plaintiff should be well-aware of MDHI's policy of prohibiting racial discrimination, having produced a copy of MDHI's Racial and Sexual Harassment and Discrimination Policy during discovery in this litigation. *Id.* The policy clearly states that no form of racial harassment or discrimination will be tolerated at MDHI, and "that appropriate disciplinary action up to and including termination of employment will be imposed on employees engaging in such improper conduct." *Id.* Had MDHI known about Plaintiff's racial comments at the time, it would have terminated his employment. DSOF ¶ 125.

## B. Plaintiff Cannot Receive Back Pay After the Date He Disclosed or Should Have Disclosed Evidence of His Wrongdoing.

The after-acquired evidence doctrine limits backpay "from the date of the unlawful discharge to the date the new information was discovered." *O'Day*, 79 F.3d at 759 (internal quotation marks omitted). But where an employee omits evidence of his misconduct in response to the employer's discovery request, backpay is cut-off at the date the plaintiff served the deficient response. *See, e.g.*, *Yeary v. Fla. Dep't of Corr.*, No. 95-0583-CIV-J-21-C, 1997 WL 284648, at *7 (M.D. Fla. May 13, 1997) (terminating backpay at the date plaintiff served her interrogatory response omitting evidence of her misconduct because "not to preclude recovery at this earlier date would be to reward dishonesty in the discovery process").

Plaintiff's Initial Disclosures were submitted on December 31, 2014. Ex. 122. The Initial Disclosures revealed the existence of Plaintiff's surreptitious audio recordings, but not the full scope of those recordings, nor the host of other wrongful conduct he undertook both before and after his employment at MDHI, including the broad swaths of MDHI documents he retained in violation of his confidentiality agreement. DSOF ¶ 119-122. Rule 26 requires parties to disclose documents in their possession, custody, or control that they may use to support their claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). Accordingly, Plaintiff should have disclosed the full scope of his possession of such materials in his Initial Disclosures. Had Plaintiff made a fulsome disclosure on December 31, 2014, MDHI would have known then that not only was Plaintiff making recordings while employed at MDHI, but he had also been taking broad categories of MDHI's documents both before and after he was terminated. Of course, Plaintiff made no disclosure about his efforts to buy the company or his leaks to reporters. *See* Ex. 122.

Instead, not until March 9, 2015, in response to MDHI's initial interrogatories and document requests, did Plaintiff disclose the massive scope of his surreptitious recordings of internal MDHI meetings and conversations, as well as some of the thousands of pages of documents relating to MDHI's business that he had improperly obtained and retained in violation of his confidentiality agreement. DSOF ¶ 122. These belatedly disclosed materials demonstrated that Plaintiff had directly or indirectly stolen corporate trade secrets and confidences and taken

actions as an employee disruptive to the functioning of MDHI and detrimental to the privacy interests of the company and its employees. Moreover, had Plaintiff complied with MDHI's initial discovery requests, he would have produced his emails transmitting MDHI's information to Bear and his communications related to his leaks to reporters. But Plaintiff continued to affirmatively conceal the full scope of his wrongful conduct, including multiple email addresses that he had used for relevant communications, and forcing MDHI to discover it only through an iterative process requiring multiple discovery motions, third party subpoenas, and depositions that has continued as recently as June 2017, when Plaintiff revealed the existence of yet another email address containing relevant (but never-before-produced) material. DSOF ¶¶ 123-124; *see also* Dkt. 340 at 18-22 & 18 n.1.

In any event, even Plaintiff's partial disclosure of his extensive misconduct revealed facts that would have caused MDHI to terminate his employment, had it known of them at the time he was employed by the company. DSOF ¶ 125. Thus, as a matter of law, any award of backpay must be limited to the period between August 23, 2013, and December 31, 2014, and Plaintiff is not entitled to front pay or reinstatement.

## IV. MDHI Is Entitled to Summary Judgment as to Liability on Counterclaims 1, 7, 8.

Plaintiff, sometimes with the help of other MDHI employees (including Kathy Rupp and Cherie Erickson), indiscriminately took, retained, and disseminated MDHI's confidential information to reporters and other third parties. Plaintiff's clear and repeated breaches of his confidentiality agreement, and his inducement of other employees to breach their own agreements, violated MDHI's right to maintain control over its confidential information and caused it to incur costs to recover its materials and stop Plaintiff from publicizing its information.

### A. The Undisputed Record Demonstrates Plaintiff Repeatedly Breached His Confidentiality Agreement (Counterclaim 1).

To establish Plaintiff's liability for breach of his confidentiality agreement, MDHI need only prove "(1) the existence of a valid contract; (2) its breach; and (3) resulting damages." *Cafasso,* 2009 WL 1457036, at *13. Each element is satisfied here.

**Existence of a valid contract.** Plaintiff entered into a confidentiality agreement with MDHI at the commencement of his employment in January of 2012. DSOF ¶ 101. That agreement provides that Plaintiff shall not disclose MDHI's confidential information during or after his employment with the company, and specifies that this duty continues after termination. *Id.* The agreement defines "Confidential Information" broadly to include, among other categories, information related to MDHI's products and designs, business practices and plans, trade secrets, manuals, proprietary information, and "all other categories of information which have commercial value to MDH[I] and provide MDH[I] with a competitive advantage or are disclosed in confidence to the Employee." DSOF ¶ 102. Upon termination of his employment, Plaintiff was required to return to MDHI all materials containing MDHI's confidential information, whether created by him or others. DSOF ¶ 103-104.

**Breach.** As the record—including Plaintiff's own admissions—demonstrates, Plaintiff has pervasively breached his confidentiality agreement by taking, maintaining, and disseminating MDHI's confidential information. DSOF ¶¶ 110-114. Ninth Circuit law is clear that relators who take confidential material that is not "reasonably necessary to pursue an FCA claim" are not excused from obligations under a confidentiality agreement. *Cafasso,* 637 F.3d at 1062 (9th Cir. 2011).[5] Swept up in Plaintiff's extensive theft of MDHI's materials were items containing MDHI's privileged communications, trade secrets, and documents entirely unrelated to Plaintiff's *qui tam* claims, including documents concerning MDHI's financial information, sales strategies and prospective business assessments, and dealings with foreign distributors. DSOF ¶¶ 44, 46-47. Moreover, Plaintiff has acknowledged that he provided information about MDHI to non-governmental parties, including a private citizen (Bear) who "smelled a story" and whom Plaintiff

---

[5] The *Cafasso* court expressly declined to decide whether to adopt a public policy exception to confidentiality agreements for the theft of <u>relevant</u> documents. The court, however, was unequivocal that, even if such an exception were adopted, it would be the relator's burden to make a "particularized showing" that the stolen documents were necessary to pursue an FCA claim. 637 F.3d at 1062 ("Were we to adopt a public policy exception to confidentiality agreements to protect relators—a matter we reserve for another day—those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim. Cafasso has made no such particularized showing.").

claimed was a purported former CIA operative, as well as to would-be investors, reporters and competitors. DSOF ¶¶ 110-114; Ex. 92; Ex. 3 (Marsteller Dep.) at 236:7-12, 238:5-8; 239:11-12.

Moreover, even Agent Stamper conceded that the material Plaintiff provided to him was comprised of "a lot of stuff that wasn't really relevant to the [investigation.]" Ex. 10 (Stamper Dep.) at 243:16-18.

After his termination, Plaintiff remained subject to his confidentiality agreement—and he continued to breach it. DSOF ¶¶ 103, 110-114. Indeed, Plaintiff expanded the scope of his breach by acquiring additional confidential information regarding MDHI through solicitation of then-employees of the company, including Rupp and Erickson. DSOF ¶¶ 115-117. This information included trade secrets related to MDHI's proprietary pricing model and other confidential business documents. *Id.* During this period, Plaintiff was attempting to run his own business buying and selling used MDHI helicopters. Ex. 3 (Marsteller Dep.) at 16:8-13; 29:11-30:9. With the aid of his co-conspirators, Plaintiff also obtained MDHI's privileged communications with inside and outside counsel on numerous MDHI matters, including extensive briefings on privileged interviews with MDHI employees conducted by MDHI's outside counsel in this case, Williams & Connolly LLP. DSOF ¶ 116.

Plaintiff's theft of vast amounts of MDHI's confidential and privileged material violated his confidentiality agreement and was not reasonably necessary to pursue his *qui tam* action and so cannot excuse his breach. *See Cafasso*, 2009 WL 1457036, at *13 (D. Ariz. May 21, 2009) (rejecting FCA relator's argument that public policy excused breach of confidentiality agreement where relator did not give files she took to government agent); *Cafasso*, 637 F.3d at 1062 (holding that even if a public policy exception to confidentiality agreement exists, relator bears burden to show that material removed was "reasonably necessary to pursue an FCA claim"). Moreover, no public policy exception would cover Plaintiff's dissemination of MDHI's information to reporters and other third parties. There can be no dispute that Plaintiff breached his agreement.

**Resulting damages.** Plaintiff's extensive breaches of his confidentiality agreement have caused MDHI to incur damages. Among other harms, Plaintiff's conduct has caused irreparable damage to MDHI's right to maintain the confidentiality of the information that Plaintiff has

misappropriated and publicly disseminated, DSOF ¶ 105, and it has caused MDHI to incur substantial costs in connection with seeking the return of its materials, protecting its materials going forward, and enforcing Plaintiff's compliance with his non-disclosure obligations, Tilton Decl. ¶ 10.

As to the former, Plaintiff acknowledged in his confidentiality agreement that his breach of the agreement would "constitute immediate and irreparable damage to MDHI, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order of specific performance and other equitable relief." DSOF ¶ 105. Plaintiff's acknowledgement alone is sufficient to establish that MDHI has been damaged by Plaintiff's wrongful possession and dissemination of its confidential material. *See, e.g., Cheeks v. Gen. Dynamics C4 Sys. Inc.*, 684 F. App'x 658, 659 (9th Cir. 2017) (employee's possession of documents in breach of confidentiality agreement damaged employer where agreement specified that "failure to comply with the agreement would irreparably harm the business" of the employer); *Cafasso*, 2009 WL 1457036, at *13 (same).

As to the latter, MDHI has incurred significant costs related to its efforts to recover its confidential materials, to detect and deter similar misappropriation efforts by Plaintiff and his confederates, and to force Plaintiff to comply with the terms of his confidentiality agreement. Tilton Decl. ¶ 10. In *Cafasso*, the court rejected an FCA relator's argument that the employer had not been damaged by her theft of company material because she did not disseminate the documents to anyone but her lawyer and the government. 2009 WL 1457036, at *13. The court held that the employer was damaged by the employee's breach of her confidentiality agreement because it was deprived of its right to maintain the confidentiality of its information and had incurred legal costs to enforce that right. *Id.* Here, not only has Plaintiff acquired and maintained MDHI's confidential information, but he has circulated MDHI's confidential documents to non-governmental third parties, including in his role as a source for numerous, news stories about MDHI. DSOF ¶¶ 110-114. MDHI has incurred significant costs to reacquire its confidential material from Plaintiff and his co-conspirators, Rupp and Erickson, to install software to detect and deter them from continuing to misappropriate MDHI's confidential information, and to

enjoin Plaintiff from continuing to violate his non-disclosure obligations.  Tilton Decl. ¶ 10. These costs are additional damages establishing Plaintiff's liability for breach of his confidentiality agreement.  *See id.*; *Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1026 (D. Ariz. 2014) (granting employer's motion for summary judgment on claim for breach of confidentiality agreement because employer "undoubtedly suffered damages—in the form of attorney's fees and costs— proximately caused by Plaintiff's breach of contract").

### B. Plaintiff's Solicitation of MDHI's Information from Rupp and Erickson Breached Arizona's Statutory and Common Law (Counterclaims 2 & 7).

After Plaintiff was terminated and could no longer take MDHI's material himself, he enlisted then-employees Rupp and Erickson to do it for him.  DSOF ¶ 116-118.  Rupp and Erickson both had confidentiality agreements with the company containing non-disclosure provisions substantially similar to those contained in Plaintiff's agreement.  DSOF ¶ 118.  Plaintiff was aware of these agreements and their confidentiality requirements.  *Id.*  Notwithstanding this, at Plaintiff's direction, Rupp and Erickson searched for, took, and sent MDHI's documents to Plaintiff.  DSOF ¶¶ 116-118.  Rupp and Erickson also provided Plaintiff with continual updates on MDHI's confidential activities, including communications with inside and outside counsel concerning DOJ's inquiry.  *Id.*  Plaintiff had already commenced his sealed *qui tam* litigation against MDHI by this time, unbeknownst to MDHI, and was also selling MDHI aircraft in competition with MDHI.  DSOF ¶ 53; Ex. 4 (Marsteller Dep.) 16:8-13; 29:11-30:9.

In soliciting and receiving MDHI's information from Rupp and Erickson, Plaintiff violated the Arizona Uniform Trade Secrets Act ("AUTSA"), Ariz. Rev. Stat. Ann. §§ 44-401-407, and tortiously interfered with their confidentiality agreements.[6]

**Misappropriation of Trade Secrets (Counterclaim 2).**  The AUTSA provides relief for the misappropriation of trade secrets.  A trade secret is information that the holder has made reasonable efforts to protect, and which derives independent economic value from not being

---

[6] The AUTSA does not preempt common-law tort claims based on the misappropriation of confidential information that does not rise to the level of a trade secret.  *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, 181 (2014).  MDHI's claim for tortious interference with contract is thus distinct from its claim for Plaintiff's misappropriation of trade secrets.

known to or readily ascertainable to other persons who could obtain economic value from its disclosure. A.R.S. § 44-401(4). The Act defines misappropriation as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 44-401(2)(a). Improper means includes "breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 44-401(1). Liability under the AUTSA is established by showing (1) the existence of a trade secret; (2) actions taken to maintain its secrecy; (3) misappropriation; and (4) resulting damages. *Covid, Inc. v. Misencik*, No. 1 CA-CV 12-0666, 2014 WL 1056794, at *5 (Ariz. Ct. App. Mar. 18, 2014).

Plaintiff filed his *qui tam* complaint on May 3, 2013. Dkt. 1. Over *one year* later, Plaintiff solicited and received from Rupp, then an MDHI employee, "dashboards" related to contracts at issue in that complaint. DSOF ¶¶ 115-117; Exs. 36, 46. A dashboard is an internal proprietary MDHI model used to price helicopter sales, and it contains cost and revenue information and the expected profit margin on the sale price. Tilton Decl. ¶ 9(i). This information is a trade secret which MDHI goes to great lengths to protect, including restricting employee access and requiring employees to sign confidentiality agreements. *Id.* Plaintiff was aware of Rupp's confidentiality obligations and his solicitation and receipt of MDHI's dashboards from Rupp was accordingly a misappropriation of MDHI's trade secrets. DSOF ¶ 118. The costs MDHI has incurred to recover its trade secrets are damages under the AUTSA. *See Food Servs. of Am., Inc. v. Carrington*, No. CV-12-00175-PHX-GMS, 2013 WL 4507593, at *14 (D. Ariz. Aug. 23, 2013) (expenses incurred to investigate misappropriation are damages under AUTSA). Accordingly, MDHI is entitled to summary judgment as to liability on its counterclaim for misappropriation of trade secrets.

**Tortious Interference with Contract (Counterclaim 7).** To establish liability for tortious interference with contract, a claimant must show (1) the existence of a valid contractual relationship; (2) the interferor's knowledge of the relationship; (3) intentional interference inducing or causing breach; (4) resultant damage. *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1077 (D. Ariz. 2015).

Plaintiff knew that Rupp and Erickson had confidentiality agreements that prohibited them from disclosing MDHI's confidential information. DSOF ¶ 118. Plaintiff's emails and records of conversations with Rupp and Erickson show that he intentionally and repeatedly interfered with those agreements. *See, e.g.*, Exs. 89; 36; 46; 47. From August 2013 to November 2014, Rupp and Erickson provided Plaintiff with documents and reports on purported MDHI business, such as government contracts, sales strategy, internal meetings, and MDHI's communications with its inside and outside counsel. DSOF ¶¶ 115-117. MDHI has incurred costs to retrieve its confidential information from Plaintiff and his confederates, and to install software to detect and deter them from future attempts at misappropriation of MDHI confidential information. Tilton Decl. ¶ 10. MDHI is thus entitled to summary judgment as to liability on its tortious interference claim.

## V. Ruth Marsteller Is Not a Proper Plaintiff.

Although included in the caption, Mrs. Marsteller lacks standing to pursue the only claims pleaded in the Complaint. Those federal statutory retaliation claims are both limited, by their plain language, to employees. 31 U.S.C. § 3730(h); 10 U.S.C. § 2409(a)(1). Mrs. Marsteller is not, was not, and never has been employed by MDHI. DSOF ¶ 2. As such, Mrs. Marsteller is not a proper plaintiff and should be dismissed as a plaintiff from this action. (She remains a counterclaim defendant under Ariz. Rev. Stat. § 25-215.)[7]

---

[7] Plaintiffs' counsel has represented that Mrs. Marsteller does not intend to pursue damages for emotional distress or loss of consortium, but that they believe that she cannot be dismissed as a plaintiff entirely because Arizona is a community property state. The parties may be able to resolve this issue by stipulation prior to the completion of summary judgment briefing.

**CONCLUSION**

For the reasons set forth above, MDHI's motion for summary judgment should be granted.

DATED: September 12, 2017

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

By: s/ L. Eric Dowell
    L. Eric Dowell (AZ Bar No. 011458)

2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 778-3700
Facsimile: (602) 778-3750
eric.dowell@ogletreedeakins.com

*Attorneys for Defendant MD Helicopters, Inc.*

Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By: s/ Christopher N. Manning
    Christopher N. Manning (pro hac vice)
    Edward C. Reddington (pro hac vice)
    Juli Ann Lund (pro hac vice)
    Tracey A. Fung (pro hac vice)
    David M. Berman (pro hac vice)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
cmanning@wc.com
ereddington@wc.com
jlund@wc.com
tfung@wc.com
dberman@wc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of September, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Ruth Brown
Heather Lewis Donnell
Michael Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL  60607
ruth@loevy.com
heather@loevy.com
mike@loevy.com
frank@loevy.com

*Attorneys for Plaintiffs Ruth and Philip Marsteller*

s/ Susan Stimson