Christopher N. Manning (pro hac vice)
Edward C. Reddington (pro hac vice)
Juli Ann Lund (pro hac vice)
Tracey A. Fung (pro hac vice)
David Berman (pro hac vice)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:    (202) 434-5000
Facsimile:    (202) 434-5029
cmanning@wc.com
ereddington@wc.com
jlund@wc.com
tfung@wc.com
dberman@wc.com

L. Eric Dowell (AZ Bar No. 011458)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:    (602) 778-3700
Facsimile:    (602) 778-3750
eric.dowell@ogletreedeakins.com

*Attorneys for Defendant MD Helicopters, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PHILIP A. MARSTELLER and RUTH MARSTELLER,<br><br>Plaintiffs,<br><br>v.<br><br>MD HELICOPTERS, INC.,<br><br>Defendant. | Case No. CV-14-01788-PHX-DLR<br><br>**DEFENDANT MD HELICOPTERS, INC.'S LOCAL RULE 56.1 STATEMENT OF FACTS**<br><br>**FILED UNDER SEAL** |

Pursuant to Local Civil Rule 56.1(a), Defendant MD Helicopters, Inc. ("MDHI") provides the following statement of undisputed material facts in support of its motion for summary judgment.

## PLAINTIFF'S TROUBLED EMPLOYMENT HISTORY

1.      Plaintiff Philip Marsteller ("Plaintiff") was hired by MDHI as an at-will employee in January 2012, and his employment was terminated on August 23, 2013.  Ex. 3 (Marsteller Dep.) at 35:19-36:1; Declaration of Lynn Tilton ("Tilton Decl.") ¶ 9.

2.      Plaintiff Ruth Marsteller has never been an employee of MDHI.  Ex. 5 (R. Marsteller Dep.) at 31:23-32:7.

3.      Both during and after Plaintiff's employment with MDHI, Lynn Tilton has been the Chief Executive Officer and Chairwoman of the Board of MDHI and has held a controlling ownership interest in the company.  Ex. 12 (Tilton Dep.) at 21:4-22:10; Tilton Decl. ¶ 2.

4.      During Plaintiff's employment with MDHI, two other entities, Patriarch Partners, LLC ("Patriarch Partners"), which at the time was a collateral manager to certain investment funds, and Patriarch Partners Management Group ("PPMG"), which employs a group of operational leaders who work with Patriarch portfolio companies, provided advice and assistance to Tilton regarding the various business entities with which she was involved, including MDHI. Ex. 12 (Tilton Dep.) at 23:24-25:7.  (For ease of reference, Patriarch Partners and PPMG are collectively referred to herein as "the Patriarch entities.")

5.      During his 19-month tenure at MDHI, Plaintiff was a source of friction, regularly "stirring the pot" by spreading gossip and criticizing his co-workers, including telling other MDHI employees that various co-workers were "worthless," "incompetent," not "real bright," "an absolute idiot," and "absolutely worthless."  Ex. 11 (Strickland Dep.) at 50:19-22; 194:4-195:6; Ex. 7 (Ruppert Dep.) at 207:5-208:15; Ex. 1 (Daddario Dep.) at 160:14-20; Ex. 3 (Marsteller Dep.) at 35:19-36:1; 87:4-88:14; 89:1-15; 92:17-93:14; 94:19-96:15; 98:2-99:20; 100:25-101:9; 112:14-114:6.

6.      Plaintiff recorded himself making derogatory, offensive comments and unflattering generalizations about people based on their race, in violation of MDHI's clear proscription on such conduct.  Ex. 126 (Audio File); Ex. 30.

7.      Plaintiff's behavior towards other MDHI employees was so bad that his supervisor Craig Kitchen ("Kitchen") told him in the summer of 2013, "Phil, everybody hates you," to which Plaintiff responded, "Yeah, probably."  Ex. 3 (Marsteller Dep.) at 120:12-19.

8.      In April 2013, Plaintiff was informed that Tilton had expressed concerns that he was not generating sufficient helicopter sales to justify his travel expenses.  Ex. 3 (Marsteller Dep.) at 122:16-123:12; 125:9-126:16; *see also* Ex. 12 (Tilton Dep.) at 36:3-37:13; *see also* Ex. 8 (Schopfer Dep.) at 74:14-22; Tilton Decl. ¶ 7.

9.      In July 2013, Plaintiff repeatedly left work early, leading to him being warned by Kitchen that Tilton was concerned about Plaintiff's work attendance.  Ex. 3 (Marsteller Dep.) at 98:10-20.

10.      In July 2013, Plaintiff was informed that he was violating MDHI's travel policy by failing to submit expenses in a timely manner and by failing to document some of his expenses.  Ex. 3 (Marsteller Dep.) at 127:23-128:18; *see also* Ex. 1 (Daddario Dep.) at 167:17-168:14; Ex. 86.

11.      Plaintiff also was informed in July 2013 that he was violating MDHI's travel policy by flying business class instead of coach class without receiving prior authorization from Tilton, a policy he had been informed about more than a year earlier.  Ex. 3 (Marsteller Dep.) at 128:23-132:14; Ex. 19.

12.      Plaintiff chafed against the limitations of his position, complaining that he was not being utilized to his full ability, criticizing MDHI management and policies, and suggesting he should be in charge.   Ex. 21; Ex. 3 (Marsteller Dep.) at 103:25-105:10; 107:10-108:4; *see also* Ex. 1 (Daddario Dep.) at 163:15-165:23.

13.      Plaintiff acknowledged, however, that his own management style was to "beat the shit out of [people]."  Ex. 3 (Marsteller Dep.) at 107:10-109:10.

14.      Plaintiff was informed that he needed to follow company policy regarding pricing and commissions.  Ex. 20; Ex. 23; Ex. 22.

15.     Plaintiff, however, repeatedly attempted to exceed his authority at MDHI, including by proposing pricing different from that approved by Tilton; by attempting to pay unapproved commissions; and by hiring distributors without approval.  Ex. 20; Ex. 23; Ex. 22; Ex. 3 (Marsteller Dep.) at 148:4-149:24; 154:13-157:9; 157:24-161:10; 162:17-163:14; 164:15-165:21; Ex. 12 (Tilton Dep.) at 57:24-58:8; Ex. 13 (Tilton Dep.) at 249:1-250:7; Tilton Decl. ¶ 7.

## PLAINTIFF'S ALLEGATIONS

16.     When Plaintiff first spoke with Agent Lance Stamper ("Agent Stamper") in February 2013, Plaintiff identified three allegations that he asserted were crimes:  (1) failure to offer the government the lowest price on certain helicopter contracts; (2) MDHI's purported hiring of former Army Colonel Norbert Vergez ("Vergez"); and (3) a $30,000 relocation allowance paid to Vergez in exchange for his agreeing to move for his new job, which Plaintiff asserted to Agent Stamper was a bribe.  Ex. 9 (Stamper Dep.) at 315:1-4; 315:21-317:3; 325:21-326:5; 332:2-7; Ex. 116.

17.     Plaintiff asserted that government contracts required that the government receive the lowest price at which a good or service had ever been provided.  Ex. 116; Ex. 117; Ex. 123 at 23-24 (Mar. 9, 2015).

18.     None of the helicopter sales contracts identified by Plaintiff in his *qui tam* complaint contained a "most favored customer" or "price reduction" clause requiring that the helicopters be sold at the lowest price.  Tilton Decl. ¶ 11.

19.     While at the Army, Vergez had been in charge of the Non-Standard Rotary Wing Aircraft ("NSRWA") office, which oversaw certain of MDHI's helicopter sales to U.S. and foreign militaries.  Vergez was not, however, the contracting officer for those contracts, and he had no authority to award contracts in his role.  Ex. 9 (Stamper Dep.) at 323:22-324:7; Federal Acquisition Regulation §§ 1.601-1.604.

20.     Following his retirement from the Army, Vergez commenced civilian employment as an employee of PPMG—not MDHI.  Vergez was not employed by MDHI at any time during Plaintiff's employment with MDHI.  Ex. 12 (Tilton Dep.) at 104:17-25; Ex. 8 (Schopfer Dep.) at 47:4-6.

21. Plaintiff was aware at the time he made his allegations to Agent Stamper that Vergez had obtained an ethics opinion permitting him to work for PPMG. Ex. 116.

22. In fact, it is common for former members of the military to work for private companies after leaving the military. Ex. 9 (Stamper Dep.) at 266:2-267:7.

23. Plaintiff was informed by MDHI employees that the hiring of Vergez by PPMG had been fully vetted and approved by the Army. Ex. 135 (Audio File); *see also* Ex. 8 (Schopfer Dep.) at 48:6-16, 49:19-50:6.

24. Plaintiff had no first-hand knowledge to support his claim that the relocation allowance payment to Vergez was a bribe; rather, he simply relied on office gossip by co-workers. Ex. 116; Ex. 117.

25. Relocation payments, including relocation payments made to former members of the military, are not illegal. Ex. 9 (Stamper Dep.) at 334:3-335:1.

26. In an April 2013 conversation with Scott Whalen, an employee of Patriarch Partners at the time, Plaintiff acknowledged that the relocation allowance payment to Vergez was for relocation, instead cautioning only that it had "the <u>appearance</u> of a bribe." Ex. 127 (Audio File) (emphasis added).

## PLAINTIFF'S UNLAWFUL CONDUCT AS A *DE FACTO* AGENT

27. Agent Stamper is a criminal investigator with the Department of Defense, Office of Inspector General ("DODIG"). Ex. 9 (Stamper Dep.) at 265:15-17.

28. At all relevant times, Agent Stamper had only two criminal investigations open: one entitled "Avia Baltika," and another entitled "Colonel Norbert Vergez" (collectively, "DODIG Investigations"). Ex. 9 (Stamper Dep.) at 305:10-23.

29. The Vergez investigation was a spin-off from the Avia Baltika investigation. Ex. 9 (Stamper Dep.) at 241:18-242:5.

30. The Avia Baltika investigation involved allegations that Vergez had conflicts of interest with the company Avia Balitka while he was serving in the U.S. Army. Ex. 9 (Stamper Dep.) at 34:4-10.

31.     Agent Stamper interacted with Plaintiff only with respect to the DODIG Investigations.  Ex. 9 (Stamper Dep.) at 305:20-306:3.

32.     When they were opened, the DODIG Investigations were looking into allegations related to Vergez's activities while he was still on active duty and were unrelated to MDHI, Patriarch Partners and Tilton.  Ex. 10 (Stamper Dep.) at 336:7-337:1.

33.     In contrast with Avia Baltika and Vergez, Agent Stamper never opened a case file or investigation of MDHI, the Patriarch entities, or Tilton.  Ex. 9 (Stamper Dep.) at 239:19-240:23; 305:10-306:12.

34.     Additionally, neither MDHI, the Patriarch entities, nor Tilton was ever identified as a subject of Agent Stamper's investigations.  Ex. 9 (Stamper Dep.) at 312:24-313:12.

35.     From the beginning of their interactions, Agent Stamper had a close working relationship with Plaintiff, communicating with him frequently and regularly asking Plaintiff to obtain documents and information for him.  Ex. 9 (Stamper Dep.) at 82:18-84:15; 103: 21-25; 339:3-9; 341:7-18; Ex. 10 (Stamper Dep.) at 81:20-105:14; 117:1-118:23; 122:11-123:6; 126:25-132:4; 135:5-136:14; 149:17-152:14; 156:21-157:11.

36.     Among the documents that Agent Stamper asked Plaintiff to obtain were emails taken from MDHI's premises.  Ex. 9 (Stamper Dep.) at 340:4-8.

37.     With respect to emails, Agent Stamper gave Plaintiff specific directions on how to transfer MDHI emails and other materials from MDHI's computer systems to a personal hard drive.  Ex. 10 (Stamper Dep.) at 81:20-94:13; Ex. 113.

38.     Agent Stamper had to consult with IT professionals at DODIG to provide these instructions to Plaintiff.  Ex. 10 (Stamper Dep.) at 85:2-10.

39.     Agent Stamper also instructed Plaintiff to collect source code for MDHI and Patriarch Partners emails, as well as for emails from another company owned by Tilton, American LaFrance.  Ex. 10 (Stamper Dep.) at 94:14-103:5 Ex. 106; Ex. 111; Ex. 110.

40.     Plaintiff followed Agent Stamper's directions and obtained this electronic information.  *Id.*

41.     Agent Stamper also was interested in investigating possible import/export violations. Ex. 9 (Stamper Dep.) at 346:25-347:11.

42.     As a result, Agent Stamper specifically asked Plaintiff to obtain information and documents related to possible import/export violations at MDHI. Ex. 9 (Stamper Dep.) at 346: 19-24.

43.     Plaintiff had not raised import/export violations in his initial allegations to Agent Stamper. Ex. 9 (Stamper Dep.) at 346: 2-11.

44.     Plaintiff regularly responded to requests from Agent Stamper for specific documents or information from MDHI, including materials that had no connection to Plaintiff's False Claims Act allegations. Ex. 3 (Marsteller Dep.) at 282:11-283:18; Ex. 118; Ex. 112; Ex. 119; Ex. 113; Ex. 111; Ex. 109; Ex. 67; Ex. 57; Ex. 52; Ex. 55; Ex. 107.

45.     Agent Stamper would not, without a search warrant, have been able to obtain the information he requested on his own. Ex. 9 (Stamper Dep.) at 351:11-14.

46.     Plaintiff also took, and provided to Agent Stamper, extensive documents and information related to MDHI, Tilton, and Vergez, including documents unrelated to any allegation Plaintiff had raised and unrelated to any issue in the DODIG Investigations, including materials on MDHI's internal meetings, MDHI's teaming agreements, MDHI's employment of consultants and brokers, and MDHI's business activities in Columbia. Ex. 31-36, 41-50, 54, 59, 69-70, 74-75, 84, 88-89, 91, 101-102, 120; Ex. 9 (Stamper Dep.) at 275:25-277:5; Ex. 10 (Stamper Dep.) 243:11-16.

47.     Other materials Plaintiff obtained outside the scope of his regular duties at MDHI included consulting contracts for services provided to MDHI, expense reports for Vergez, and travel schedules for Vergez and Tilton. Plaintiff likewise provided such material to Agent Stamper. Ex. 3 (Stamper Dep.) at 284:2-6; 285:2-287:14; Ex. 58; Ex. 56; Ex. 55; Ex. 51.

48.     At the direction and with the knowledge and acquiescence of Agent Stamper, Plaintiff ultimately provided Agent Stamper with many MDHI documents that Plaintiff had obtained both during and after his employment at MDHI. Ex. 9 (Stamper Dep.) at 345:9-18.

49.     Among the MDHI materials that Plaintiff provided to Agent Stamper was information that was, on its face, subject to MDHI's attorney-client privilege.  Ex. 59; Ex. 105.

50.     Following his first meeting with Agent Stamper, Plaintiff began secretly recording conversations with his co-workers, as well as with Scott Whalen (an employee of Patriarch Partners at the time), because Agent Stamper told him that such recordings would be helpful.  Ex. 3 (Marsteller Dep.) at 66:21-67:8; 71:10-17; 72:3-73:8; *see also* Ex. 124 (RFA Resp. 18).

51.     On August 23, 2013, the day the company received a preservation letter from the Civil Division of the U.S. Department of Justice ("DOJ"), Agent Stamper called and emailed Plaintiff and expressly instructed Plaintiff to get his recording device to record the activities at MDHI that day.  Ex. 10 (Stamper Dep.) at 171:24-172:11; Ex. 114; Ex. 136 (Audio File).

52.     Plaintiff was told by Agent Stamper that he should file a *qui tam* action because it would assist Agent Stamper with his criminal DODIG Investigations.  Ex. 80.

53.     Plaintiff later did file a *qui tam* action under seal in the spring of 2013.  *Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. May 3, 2013), Dkt. 1.

54.     Prior to filing, Plaintiff shared his draft *qui tam* complaint with Agent Stamper.  Ex. 117.

55.     Plaintiff's *qui tam* action was not unsealed until September 2014.  *Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. Sept. 17, 2014), Dkt. 18.

56.     Agent Stamper also asked Plaintiff to draw floor plans and take pictures for him of MDHI's premises and obtain addresses of MDHI property.  Ex. 9 (Stamper Dep.) at 289:18-23; 298:8-13; 339:10-12.

57.     Agent Stamper directed Plaintiff to do so in advance of an anticipated "raid."  Ex. 3 (Marsteller Dep.) at 281:24-282:10; Ex. 10 (Stamper Dep.) at 123:10-14; Ex. 115; Ex. 53; *see also* Ex. 124 (RFA Resp. 19).

58.     Agent Stamper also directed Plaintiff to obtain information about servers associated with MDHI and the Patriarch entities in an attempt to justify a search warrant.  Ex. 9 (Stamper Dep.) 181:18-183:23.

59. The "raid" never occurred, as Agent Stamper's requests for search warrants were each rejected, by different prosecutors, during the internal review process. Ex. 10 (Stamper Dep.) at 193:21-203:9.

60. Even after Agent Stamper's request for search warrants were denied, Agent Stamper continued to request MDHI's documents and information from Plaintiff. Ex. 10 (Stamper Dep.) at 340:18-341:13; Ex. 67; Ex. 52; Ex. 55; Ex. 107.

61. Agent Stamper never made a formal request for information from MDHI, any of the Patriarch entities, or Tilton. Ex. 9 (Stamper Dep.) at 263:18-25.

62. Agent Stamper never requested MDHI or the Patriarch entities to provide any documents or to make their employees available for interview. Ex. 9 (Stamper Dep.) at 264:1-8.

63. Plaintiff also conducted surveillance outside MDHI's office on Agent Stamper's behalf, including tracking vehicles owned by Vergez and photographing a vehicle owned by Tilton. Ex. 3 (Marsteller Dep.) at 281:24-282:10; Ex. 10 (Stamper Dep.) at 123:10-14; Ex. 115; Ex. 53; *see also* Ex. 124 (RFA Resp. 19).

64. Agent Stamper also asked Plaintiff to obtain the names and phone numbers of MDHI employees. Ex. 9 (Stamper Dep.) at 340:21-25.

65. Agent Stamper asked Plaintiff to obtain these phone numbers so that Agent Stamper could issue subpoenas to third parties for evidence in support of the DODIG Investigations. Ex. 9 (Stamper Dep.) at 342:1-14.

66. A neutral magistrate never authorized any of Agent Stamper's investigative activities that were conducted through Plaintiff. Ex. 10 (Stamper Dep.) at 194:6-195:13; 202:16-203:3; 205:9-209:6; 210:5-212:25.

67. Agent Stamper subsequently was removed from the DODIG Investigations and barred from further communications with Plaintiff, by direction of the prosecutors assigned to the Vergez investigation. In his lengthy career, Agent Stamper had never before been removed from an investigation. Ex. 10 (Stamper Dep.) at 255:7-21; 256:25-259:11; 261:6-22; 337:3-13.

68. Vergez pled guilty to charges that related only to actions he took while still a government employee; he was not charged for any actions he took while employed by any

companies owned by Tilton or affiliated with MDHI, nor was he charged with accepting a bribe from any companies owned by Tilton or affiliated with MDHI. Ex. 9 (Stamper Dep.) at 313:16-24; 333:1-20.

69. No charges of any kind were brought against MDHI, the Patriarch entities, or Tilton, including in connection with the DODIG Investigations or the allegations raised by Plaintiff. Ex. 9 (Stamper Dep.) at 304:10- 305:9; 312:24-314:5; 333:1-20; Ex. 3 (Marsteller Dep.) at 268:1-7.

70. The government has never terminated an existing contract with MDHI, or barred MDHI from entering into new contracts, as a result of Vergez's guilty plea or any of the allegations raised by Plaintiff. To the contrary, MDHI continues to be awarded government contracts, including as recently as September 5, 2017, when MDHI was awarded a U.S. Army contract worth as much as $1.385 billion for the procurement of up to 150 MD 530F aircraft and required production support services. Tilton Decl. ¶ 11; U.S. Dep't of Defense, Contracts, Release No. CR-172-17 (Sept. 5, 2017), https://www.defense.gov/News/Contracts/Contract-View/Article/1299955; *see also* U.S. Dep't of Defense, Contracts, Release No. CR-186-14 (Sept. 26, 2014), http://www.defense.gov/News/Contracts/Contract-View/Article/606695; U.S. Dep't of Defense, Contracts, Release No. CR-189-14 (Oct. 1, 2014), http://www.defense.gov/News/Contracts/Contract-View/Article/606698; U.S. Dep't of Defense, Contracts, Release No. CR-131-15 (July 13, 2015), http://www.defense.gov/News/Contracts/Contract-View/Article/612889.[1]

71. The government declined to intervene in Plaintiff's *qui tam* action. Ex. 3 (Marsteller Dep.) at 267:16-25; *Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. March 31, 2016), Dkt. 17.

---

[1] As these contractual awards are "official information posted on a governmental website, the accuracy of which [is] undisputed," the Court may take judicial notice of them. *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) (alteration in original) (internal quotation marks omitted).

72.     Plaintiff's *qui tam* action was dismissed at the Rule 12 stage based on the court's conclusion that it failed to state a colorable claim under the False Claims Act.  *Marsteller and Swisher v. Tilton, et al.*, Civil Action No. 5-13-cv-00830-AKK (N.D. Ala. March 31, 2016), Dkt. 77.

### PLAINTIFF'S SELF-INTEREST IN UNDERMINING MDHI

73.     While still employed by MDHI, and continuing after his termination, Plaintiff spoke with multiple individuals or groups in an effort to put together an investor group to acquire MDHI.  Ex. 3 (Marsteller Dep.) at 287:16-291:23; 299:2-23; 309:5-311:25; 322:3-324:22; Ex. 85; Ex. 25, 83, 87, 93-94, 96, 98-100.

74.     In May 2013, just days before he filed his *qui tam* complaint, Plaintiff signed a non-disclosure agreement with a venture capital firm that he felt could assist him with an acquisition of MDHI.  Ex. 3 (Marsteller Dep.) at 287:16-25, 292:10-293:1; Ex. 87.

75.     Plaintiff actively assisted Agent Stamper with his investigative activities during the same period that Plaintiff was attempting to put together a group to acquire MDHI.  Ex. 3 (Marsteller Dep.) at 292:10-293:1; Ex. 10 (Stamper Dep.) at 140:6-141:25; Ex. 112.

76.     Agent Stamper was unaware at the time that Plaintiff was interested in acquiring MDHI.  Ex. 10 (Stamper Dep.) at 240:15-18.

77.     Both during and after his employment at MDHI, Plaintiff repeatedly provided reporters with information about Tilton and MDHI.  Ex. 3 (Marsteller Dep.) at 227:3-234:12; 257:21-262:21; 263:11-264:5; Ex. 71; Ex. 81.

78.     Plaintiff repeatedly linked the resulting negative publicity about MDHI with his efforts to acquire the company, including linking the negative news stories with the possibility that the value of the company would be decreased and the likelihood of a sale increased.  Exhibit 3 (Marsteller Dep.) at 293:2-297:13; 299:19-305:18; Ex. 81; Ex. 83; Ex. 90; Ex. 97.

79.     Plaintiff also linked Agent Stamper's activities—including the "raid" that Plaintiff hoped for, but which never occurred—to his effort to purchase MDHI.  Ex. 25; Ex. 10 (Stamper Dep.) at 193:21-203:9.

# PLAINTIFF'S TERMINATION

80.     On August 7, 2013, Plaintiff eavesdropped on a conversation between Kitchen and Carl Schopfer, the president of MDHI, from which Plaintiff learned that Kitchen and Schopfer were interviewing a potential replacement for MDHI's then-current Chief Financial Officer, Mike Kelley.  Ex. 3 (Marsteller Dep.) at 170:11-16.

81.     Plaintiff then told Kelley that MDHI was interviewing a replacement for him.  Ex. 3 (Marsteller Dep.) at 167:25-168:4.

82.     In addition to Kelley, Plaintiff spread this confidential personnel information that he had overheard to another co-worker, David Ruppert.  Ex. 3 (Marsteller Dep.) at 172:15-22; 174:18-24; Ex. 11 (Strickland Dep.) at 189:5-192:5.

83.     After being informed by Plaintiff that MDHI was interviewing a replacement for him, Kelley asked a co-worker, Grace Daddario, whether she knew anything about it.  Ex. 1 (Daddario Dep.) at 183:13-21.

84.     Daddario formally complained about this incident to Suzanne Strickland, the head of Human Relations at MDHI, noting that Plaintiff had engaged in similar improper behavior in the past. Ex. 1 (Daddario Dep.) at 92:23-93:23;183:22-185:6.

85.     In or around June 2012, Plaintiff had told Karen Paul, an in-house attorney at MDHI, that MDHI was planning to replace her. Ex. 124 (RFA Resp. 16); Ex. 3 (Marsteller Dep.) at 176:25-180:18.

86.     Prior to Tilton learning of Plaintiff's improper disclosure to Kelley, she had been considering terminating Plaintiff for performance reasons.  Tilton Decl. ¶ 7.

87.     When Tilton learned that Plaintiff had told Kelley, her CFO and direct report, that the company was interviewing his potential replacement, Tilton was "extremely unhappy" and "very angry" and decided that Plaintiff's employment should be terminated.  Ex. 12 (Tilton Dep.) at 69:23-71:6; 76:22-80:25; 91:1-16; Tilton Decl. ¶ 7; *see also* Ex. 3 (Marsteller Dep.) at 182:25-185:24.

88.     Although Tilton had planned to have Kelley remain at MDHI to help with the transition of his work to his successor, Kelley told Tilton that he could not stay on after Plaintiff

had disclosed the confidential information about Kelley's upcoming separation to his co-workers. Ex. 12 (Tilton Dep.) at 82:14-84:5; 84:21-85:4.

89.     On August 21, 2013, Kelley resigned prematurely, leaving MDHI without a Chief Financial Officer. Ex. 3 (Marsteller Dep.) at 190:8-10.

90.     Kelley resigned while Tilton was traveling and not at MDHI; however, she was scheduled to return to MDHI on August 23, 2013. Following Kelley's resignation, while Tilton was still out of the office, she asked Schopfer if Plaintiff had been fired yet. When she learned that Plaintiff's employment had not yet been terminated, she instructed Schopfer to terminate Plaintiff's employment. Ex. 12 (Tilton Dep.) at 89:5-90:17; 91:1-16; Ex. 8 (Schopfer Dep.) at 107:7-109:6; 110:23-111:17.

91.     Tilton told Schopfer to terminate Plaintiff's employment during a phone call made before work began on August 23, 2013. Ex. 12 (Tilton Dep.) at 89:20-90:17 (instruction given either August 21 or August 22); Ex. 8 (Schopfer Dep.) at 107:7-108:14 (instruction given either the evening of August 22 or the morning of August 23).

92.     On the morning of August 23, 2013, Tilton arrived at MDHI and learned that Plaintiff's employment had not yet been terminated. At that time, Tilton again reiterated to Schopfer that Plaintiff's employment was to be terminated that day. Ex. 12 (Tilton Dep.) at 91:18-93:24; 94:15-95:20; Ex. 8 (Schopfer Dep.) at 186:20-186:17.

93.     Tilton alone made the decision to terminate Plaintiff, a decision that she based both on performance reasons and Plaintiff's improper and unprofessional actions in relaying confidential personnel information to Kelley. Ex. 12 (Tilton Dep.) at 59:8-60:15; 64:9-65:6; Tilton Decl. ¶ 7.

94.     At the time she made the decision to terminate Plaintiff, Tilton was not aware of any of Plaintiff's complaints, including those alleging improper conduct in connection with government contracts and the hiring of Vergez by PPMG, nor was she aware of any interactions between Plaintiff and government agents or Plaintiff's sealed *qui tam* lawsuit. Ex. 12 (Tilton Dep.) at 102:23- 103:12; 105:2-22; 106:3-108:23; 109:4-16; 130:3-14; 131:2-132:19; Ex. 7 (Ruppert Dep.) at 211:22-212:7; 214:15-215:13; Tilton Decl. ¶ 8.

95.     After Tilton had made the decision to terminate Plaintiff's employment, but before Plaintiff was informed of his termination, MDHI received an August 23, 2013 letter from the Civil Division of the DOJ asking MDHI to preserve documents related to Vergez and the pricing of certain government contracts. Ex. 7 (Ruppert Dep.) at 97:4-23.

96.     The August 23, 2013 preservation letter from the DOJ Civil Division does not mention or make any reference to Plaintiff, an internal whistleblower generally, or a *qui tam* lawsuit. Ex. 18.

97.     At the time she learned of the DOJ preservation letter on August 23, 2013, Tilton believed the letter was the result of a complaint by Boeing; MDHI had recently prevailed over Boeing in an arbitration. If not Boeing, Tilton believed it was possible another competitor, named DTI, was behind the letter. Ex. 12 (Tilton Dep.) at 122:1-11; 125:5-127:5; 133:3-25; *see also* Ex. 7 (Ruppert Dep.) at 110:17-111:11; 120:17-24; Ex. 8 (Schopfer Dep.) at 149:8-18.

98.     When Plaintiff was informed of his termination on August 23, 2013, he was expressly told that his employment was being terminated because of his improper disclosure to Kelley. Ex. 7 (Ruppert Dep.) at 84:22-85:13; 118:25-120:16; Ex. 8 (Schopfer Dep.) at 135:13-23.

99.     Only *after* Plaintiff's employment was terminated did Plaintiff claim that he was a whistleblower. For example, in a conversation that he recorded with his former supervisor Kitchen the day after his termination, on August 24, 2013, Plaintiff intimated that he was a whistleblower, although in another conversation that he recorded on August 24, 2013, Plaintiff told MDHI's General Counsel, "I'm not a damn whistle-blower, David." Ex. 131 (Audio File); Ex. 134 (Audio File).

100.     Through discovery in this case, MDHI has learned about additional instances of misconduct committed by Plaintiff while Plaintiff was employed by MDHI. This misconduct includes Plaintiff's scheme to buy MDHI, revealing MDHI's confidential information to non-governmental third parties, surreptitiously recording MDHI employees, leaking information about MDHI to reporters, and making racially discriminatory comments. MDHI also has learned of misconduct that Plaintiff committed after his termination. Had MDHI been aware of any of

these activities at a time when Plaintiff was employed by MDHI, Plaintiff's employment would have been terminated.  Tilton Decl. ¶ 9.

### PLAINTIFF'S DISCLOSURE OF CONFIDENTIAL INFORMATION

101.    Plaintiff executed a confidentiality agreement with MDHI on or about January 27, 2013.  Ex. 68; Dkt. 160 ¶ 7.

102.    Plaintiffs' confidentiality agreement defines confidential information broadly to include all categories of information that have commercial value to MDHI, and all information that is disclosed in confidence to an employee.  Ex. 68; Dkt. 160 ¶ 7.

103.    The agreement contains a non-disclosure clause that prohibits the employee from disclosing or using confidential information during or after his employment, and specifies that the employee's obligations under the agreement continue after the end of employment.  Ex. 68; Dkt. 160 ¶ 7.

104.    The agreement also requires the employee to return all confidential material upon termination.  Ex. 68; Dkt. 160 ¶ 7.

105.    The agreement further specifies that the employee's breach of the agreement will "constitute immediate and irreparable damage to MDHI, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief," and that "other action may be taken and remedies enforced" against the employee.  Ex. 68; Dkt. 160 ¶ 7.

106.    Plaintiff also was issued a Business Ethics and Practices Policy Manual by MDHI.  The manual similarly directed that Plaintiff shall not use or disclose confidential information during or after his employment, and required Plaintiff to return all confidential material upon termination.  The manual defined confidential information to include information of a business and legal nature.  Ex. 29; Dtk. 160 ¶ 9.

107.    Following Plaintiff's termination, Ruppert, MDHI's in-house counsel, reminded Plaintiff of his obligations under the confidentiality agreement that Plaintiff had signed.  Ex. 133 (Audio File).

108.    Plaintiff understood that the confidentiality agreement did not prevent Plaintiff from speaking with government investigators, but it did prevent Plaintiff from talking to the press.  Ex. 3 (Marsteller Dep.) at 218:17-219:15; 220:22-221:15; Ex. 128-130 (Audio Files); Ex. 132 (Audio File).

109.    The day after he was terminated, Plaintiff denied speaking to the press, including with regard to a forthcoming Reuters article that portrayed Tilton and MDHI in a negative light.  Ex. 3 (Marsteller Dep.) at 219:16-19; 221:16-18; 225:7-226:24.

110.    In reality, Plaintiff had provided information to Reuters in connection with the forthcoming Reuters article while he was employed by MDHI, admitting this in the context of encouraging another former MDHI employee, Matt Swisher, to speak with Reuters about MDHI as well.  Ex. 3 (Marsteller Dep.) at 227:3-231:16; Ex. 82; Ex. 76.

111.    In fact, less than a week after his termination, Plaintiff told Alex Crutchfield, one of the people involved in his plan to purchase MDHI, that he was terminated in connection with his leaking information to Reuters.  Ex. 90.

112.    Also, while he was still employed at MDHI, Plaintiff sent MDHI confidential information to Randy Pullen, an investment professional interested in a possible acquisition of MDHI, and a third party named Steve Bear, whom Plaintiff knew also was not employed by the government.  Ex. 3 (Marsteller Dep.) at 235:16-236:15; 238:3-12; 299:2-14; Ex. 101.

113.    Among other material, Plaintiff sent Bear documents containing MDHI's confidential financial information, internal discussions about helicopter pricing constituting trade secrets, his sealed *qui tam* lawsuit, and Ms. Tilton's detailed itinerary for a Paris Air Show (containing her hotel and transportation information and minute-to-minute whereabouts), which Ms. Tilton was attending at the time of Plaintiff's transmission to Bear.  Ex. 3 (Marsteller Dep.) at 246:2-255:15; Ex. 77-79.

114.    Plaintiff continued to disseminate MDHI's confidential information to non-governmental third parties after his termination, including potential competitors such as Mark Young (the owner of a company named DTI, which provides logistics and training support to the United States military), and to reporters such as Richard Lardner of the Associated Press.

Plaintiff told Agent Stamper in an email that "the [AP] article was based on my actions without the knowledge of any of my attorneys" and "[i]f the US Gov attorneys have a problem with that then they need to deal with me." Ex. 3 (Marsteller Dep.) at 256:19-271:15; Ex. 4 (Marsteller Dep.) at 132:12-134:17; Ex. 26-27; Ex. 95; Ex. 121; Ex. 81.

115.    Following his termination, Plaintiff obtained MDHI's confidential information from at least two individuals who were employed by MDHI at the time, Kathy Rupp and Cherie Erickson. Ex. 32-36, 41-50, 54, 59-66, 69-70, 74, 88-89; Ex. 6 (Rupp Dep.) at 158:4-158:10; Ex. 2 (Erickson Dep.) at 130:21-131:12.

116.    Plaintiff received regular updates after his termination from Rupp and Erickson related to MDHI business, including reports of privileged communications involving MDHI's inside and outside counsel. Ex. 32-35, 41-45, 54, 59-70, 74, 88-89.

117.    Plaintiff also solicited and received MDHI confidential and trade secret information from Rupp and Erickson. Ex. 36; Ex. 46; Ex. 47; Ex. 48; Ex. 49; Ex. 50; Ex. 120.

118.    As Plaintiff knew at the time, Rupp and Erickson also had confidentiality agreements with MDHI containing substantially similar non-disclosure obligations to those in Plaintiff's agreement. Ex. 16; Ex. 17; Ex. 14; Ex. 15; Ex. 108; Dkt. 160 ¶ 8; Ex. 6 (Rupp Dep.) at 168:4-16; Ex. 3 (Marsteller Dep.) at 281:14-15.

119.    Plaintiff served his Rule 26 Initial Disclosures in this action on December 31, 2014. In his Initial Disclosures, Plaintiff revealed that he had "transcript recordings" of his termination as well as of conversations with MDHI employees. Ex. 122 at 21.

120.    Plaintiff's Initial Disclosures identified 83 categories of documents that Plaintiff stated he "may use to support [his] claims or defenses," all but 7 of which he identified as "[y]et to be provided by MD Helicopters, Inc." Apart from the "Paris air show documents," Plaintiff's Initial Disclosures failed to identify any of the thousands of pages of documents that Plaintiff improperly obtained from MDHI and retained. Ex. 122 at 21-29.

121.    On March 9, 2015, Plaintiff responded to MDHI's first set of discovery requests, which included interrogatories that required Plaintiff to identify all recordings he had made involving MDHI personnel and all communications he had had with reporters since his

termination, as well as requests for production that required him to produce all documents he had obtained from MDHI (whether or not such documents were provided to the government) and all documents regarding communications with reporters. Ex. 125; Ex. 123 at 2-5, 24.

122. Plaintiff served responses to MDHI's first discovery requests on March 9, 2015. In those discovery responses, Plaintiff identified that he had made or caused to be made 75 recordings involving MDHI employees. Plaintiff also produced numerous confidential MDHI documents, including a USB drive containing MDHI's privileged and trade secret information related to an arbitration with Boeing. Ex. 125; Ex. 123 at 2-5.

123. In response to the discovery requests related to reporters, Plaintiff identified Richard Lardner of the Associated Press as the only reporter with whom he had communicated following his termination; he denied that he had any documents related to communications with reporters. Ex. 125; Ex. 123 at 24.

124. In fact, subsequent discovery has revealed that Plaintiff had numerous communications with reporters other than Lardner, as well as emails that reflected his communications with reporters. *See, e.g.*, Exhibit 3 (Marsteller Dep.) at 227:3-234:12; 257:21-262:21; 263:11-264:5; Ex. 71; Ex. 81.

125. Had Tilton been aware, while Plaintiff was still employed by MDHI, of Plaintiff's breaches of his confidentiality agreement, his breaches of loyalty to MDHI (both by soliciting investors to purchase the company and in his communications with reporters), or his violation of MDHI policy prohibiting derogatory comments regarding groups of individuals based on their racial or ethnic background, she would have instructed that his employment be terminated. Tilton Decl. ¶ 9.

## PLAINTIFF'S DODIG COMPLAINT

126. On October 18, 2013, Plaintiff lodged a complaint with the Department of Defense ("DOD") Hotline ("October 2013 Complaint"), alleging reprisal pursuant to 10 U.S.C. § 2409. Ex. 37.

127. Plaintiff noted in the October 2013 Complaint that it related to his sealed *qui tam* action. Ex. 37.

128.     On December 24, 2013, the DODIG sent a letter to Plaintiff informing him that it declined to "initiate a whistleblower reprisal investigation into [Plaintiff's] allegations" in response to his October 2013 Complaint because the allegations are "related to individuals or circumstances that are pending criminal investigation or prosecution." Ex. 37.

129.     The DODIG informed Plaintiff that since his October 2013 Complaint related to his *qui tam* complaint, he should seek relief under 31 U.S.C. § 3730(h) instead. Ex. 37.

130.     Plaintiff subsequently asked the DODIG to reconsider the "canceling" of his complaint. Ex. 39.

131.     On January 4, 2014, the DODIG reiterated that it declined to "initiate or pursue [an] administrative investigation[ ]" of Plaintiff's allegations. In the same correspondence, the DODIG suggested Plaintiff file a reprisal complaint "once the qui tam case is complete." Ex. 39.

132.     On November 1, 2014, Plaintiff requested the DODIG to "reopen" his October 2013 Complaint. Ex. 39.

133.     Rather than re-open the October 2013 Complaint, on November 3, 2014, the DODIG instructed Plaintiff to "file a new complainant [sic] indicating that [his] qui tam case was unsealed" and to provide supporting documentation. Ex. 39.

134.     Plaintiff filed a new DOD Hotline Complaint on December 18, 2014 ("December 2014 Complaint"). Ex. 28.

135.     The DODIG assigned the December 2014 Complaint a different case number, "20141218-02909101," and began an investigation. Ex. 28; Ex. 73; Ex. 72.

136.     On May 8, 2015, Plaintiff voluntarily withdrew his December 2014 complaint, only 142 days after Plaintiff had filed it. Ex. 24.

DATED:   September 12, 2017

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

**WILLIAMS & CONNOLLY LLP**

By: s/ L. Eric Dowell
    L. Eric Dowell (AZ Bar No. 011458)

By: s/ Christopher N. Manning
    Christopher N. Manning (pro hac vice)
    Edward C. Reddington (pro hac vice)
    Juli Ann Lund (pro hac vice)
    Tracey A. Fung (pro hac vice)
    David M. Berman (pro hac vice)

2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:  (602) 778-3700
Facsimile:  (602) 778-3750
eric.dowell@ogletreedeakins.com

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile:  (202) 434-5029
cmanning@wc.com
ereddington@wc.com
jlund@wc.com
tfung@wc.com
dberman@wc.com

*Attorneys for Defendant MD Helicopters, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of September 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Ruth Brown
Heather Lewis Donnell
Michael Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL  60607
ruth@loevy.com
heather@loevy.com
mike@loevy.com
frank@loevy.com

*Attorneys for Plaintiffs Ruth and Philip Marsteller*

s/ Susan Stimson