Christopher N. Manning (pro hac vice)
Edward C. Reddington (pro hac vice)
Juli Ann Lund (pro hac vice)
Tracey A. Fung (pro hac vice)
David Berman (pro hac vice)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:     (202) 434-5000
Facsimile:     (202) 434-5029
cmanning@wc.com
ereddington@wc.com
jlund@wc.com
tfung@wc.com
dberman@wc.com

L. Eric Dowell (AZ Bar No. 011458)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone:     (602) 778-3700
Facsimile:     (602) 778-3750
eric.dowell@ogletreedeakins.com

*Attorneys for Defendant MD Helicopters, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PHILIP A. MARSTELLER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MD HELICOPTERS, INC., <br><br> Defendant. | Case No. CV-14-01788-PHX-DLR <br><br> **DEFENDANT MD HELICOPTERS, INC.'S MOTION TO EXCLUDE THE OPINION TESTIMONY OF ROBERT EQUALS AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **FILED UNDER SEAL** <br><br> **ORAL ARGUMENT REQUESTED** |

# **TABLE OF CONTENTS**

BACKGROUND .................................................................................................. - 1 -

STANDARD OF REVIEW .................................................................................. - 3 -

ARGUMENT ...................................................................................................... - 4 -

I.     Equals' Projected Damages Period Does Not Rest on Reliable Data or Methodology. ................................................................................................... - 5 -

     A.     "Worklife Expectancy" Is Not a Reliable Basis To Calculate Damages. ...... - 5 -

     B.     Generic Tenure Data Is Not a Reliable Basis To Calculate the Damages Period Here. ............................................................................................... - 6 -

          1.     Equals' Opinion Fails To Account for Relevant Tenure Data that Contradicts His Conclusion. ........................................................... - 6 -

          2.     Equals' Opinion Relies on Cherry-Picked BLS Tenure Data. ........... - 8 -

II.     Equals' Sales Projections Do Not Rest on Reliable Data or Methodology. ........... - 10 -

     A.     Equals' Projection of 10% Annual Sales Growth Does Not Rest on Reliable Data. ............................................................................................. - 10 -

     B.     Equals' Rejection of Plaintiff's Actual Sales Performance as Relevant Data Rests on Pure Speculation. ..................................................................... - 11 -

III.     Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Data or Methodology. ................................................................................................... - 13 -

     A.     Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Data. ........................................................................................................... - 13 -

     B.     Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Methodology. ................................................................................................. - 15 -

CONCLUSION .................................................................................................. - 17 -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ........................................................ 10

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ...................................... 7

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144 (9th Cir. 2012) ............................................................................................................................. 4

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ...................................... 13

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ............................ 3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .......................................... 1, 3

*Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993 (D. Ariz. 2013) .................... 3

*E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015) ......................................................... 8

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ........................................................ 3

*Eymard v. Pan Am. World Airways (In re Air Crash Disaster at New Orleans)*, 795 F.2d 1230 (5th Cir. 1986) ..................................................................................................... 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................... 3

*Lee v. City of Richmond.*, No. 3:12cv471, 2014 WL 5092715 (E.D. Va. Sept. 30, 2014) ................................................................................................................................... 6

*Moore v. Ashland Chem. Inc.*, 151 F. 3d 269 (5th Cir. 1998) ....................................... 4, 13

## OTHER AUTHORITIES

31 U.S.C. § 3730(h) ............................................................................................................ 3

Fed. R. Evid. 702 ........................................................................................................passim

Fed. R. Evid. 703 ............................................................................................................. 10

Pursuant to Fed. R. Evid. 702, Defendant MD Helicopters, Inc. ("MDHI"), by undersigned counsel, hereby moves to exclude the opinion testimony of Robert Equals ("Equals"), offered by Plaintiff Philip A. Marsteller in support of his damages claim. Equals' opinion testimony should be stricken under Rule 702 because it rests on neither reliable methodology nor reliable facts. Instead, Equals relies on rank speculation and cherry-picked data to support his desired outcome. A certified public accountant, Equals brings none of the intellectual rigor of that profession to his opinion here, instead acting as an advocate for Plaintiff. Indeed, that is the precise service that Equals advertises when he unabashedly markets himself as "assist[ing] lawyers" to "structure winning positions" and "argue the best possible position for the client." Ex. 4. Equals disregards the personalized information about Plaintiff's earnings in favor of inapplicable and aggregated survey data from the Bureau of Labor Statistics ("BLS"); cherry-picks even among that generic data based on no methodology beyond whatever will inflate Plaintiff's claimed damages; and disregards all information—including sworn testimony in this case—that conflicts with his pre-ordained result. When challenged, Equals provided no scientific explanation for his disregard of contrary facts and record evidence. Instead, apparently on the theory that the best defense is a good offense, Equals claimed to be "embarrassed" that counsel would question his failure to account for relevant data. *See* Ex. 3 (Equals Dep.) at 237:15-238:3 ("I'm embarrassed for me. I'm embarrassed for you, all of you."); *see also id.* at 252:14-21; 255:3-15.

Federal law does not permit junk science, supported only by an expert's *ipse dixit*. Instead, admissibility requires Plaintiff to prove that Equals' opinion rests on reliable data and methodology, and fits the actual facts of this case. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). That undertaking is doomed by Equals' testimony and the very sources on which he relies. As a result, the Court should exclude Equals' opinion testimony.

**BACKGROUND**

Equals submitted two opinions in this case. His original opinion ("Opinion") ignored the facts here in a number of ways designed to increase the projected damages. First, it ignored Plaintiff's 2012 sales performance, instead "adopting year 2013 as the

optimum beginning point for economic losses." Ex. 1 at 2. The Opinion did not explain what was "optimum" about this approach, but its effect was clear: using only 2013 yielded a higher damages calculation than using Plaintiff's full 19-month sales performance, as illustrated by, among other things, comparing the "2012 commissions" generated by Equals' approach ($126,628), with those actually earned by Plaintiff in 2012 ($54,000). Ex. 1 at Sched. 4; Ex. 3 at 132:2-5. Second, the Opinion projected damages out to 2026, with the explanation that "Mr. Marsteller reaches the maximum level of Social Security pension benefits at age 70 years." Ex. 1 at 2. Again, the Opinion did not explain what connection there was between Plaintiff's "maximum level of Social Security pension benefits" and a data-driven projection of Plaintiff's expected tenure at MDHI, beyond extrapolating the "maximum level" of damages. Finally, the Opinion relied on the "job offer correspondence and commissions data" provided to Plaintiff <u>before</u> he began at MDHI "to establish a foundation for Mr. Marsteller's compensation baseline and calculation of damages." Ex. 1 at 2; *see also id.* at 4. This "job offer correspondence and commissions data" represented <u>expected</u> <u>minimum</u> sales targets or examples, not the <u>actual</u> job performance of Plaintiff (or other MDHI salespersons), resulting (yet again) in inflated figures. The net result of this flawed data and methodology was an entirely unrealistic lost earnings figure of just over $6.8 million—more than <u>20 times</u> Plaintiff's earnings at MDHI.

The principal driver of this outsized number was something that the Opinion cryptically named the "Calculated Benefits" percentage. That figure—which added an extra <u>67.10%</u> to Plaintiff's projected salary and commissions <u>every year</u>—was buried in Schedule 3 to the Opinion, and identified only with the unenlightening shorthand, "DOL/BLS Benefits Rate." Ex. 1, Sched. 3. No explanation of the "Calculated Benefits" percentage was provided in the Opinion (which Equals admitted was "hardly a report. It's like a newsletter"), beyond the assertion that Equals had "reconstructed and recomputed factors to allow the calculation of lost wages and benefits." Ex. 1 at 3; Ex. 3 at 57:5-15.

On November 25, 2015, Equals served a revised opinion ("Revised Opinion"). Ex. 2. Although titled a "Rebuttal Report," the Revised Opinion included new affirmative

calculations and expressly relied on extensive additional material not disclosed with the original Opinion (all of which was available to Equals prior to July 30, 2015).[1] The Revised Opinion modified the end date through which Equals projected lost earnings and added two new (and previously undisclosed) bases for that projection: a "worklife expectancy" number, and tenure data from the BLS. The Revised Opinion also attached BLS reports as support for the "Calculated Benefits" percentage, which also changed from the original Opinion. One thing did not change, however: the Revised Opinion ignored data specifically relevant to Plaintiff, including documentary evidence (like Plaintiff's W-2s) and testimonial evidence (like sworn testimony by other MDHI employees as to the average tenure and commissions of salespersons at the company). *See, e.g.*, Ex. 3 at 126:11-127:15; 130:14-19.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 requires the district court to act as a gatekeeper and ensure the reliability and admissibility of proffered expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert*, 509 U.S. at 589. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The latter two are at issue here. Reliability requires the expert to use "reliable principles and methods" that are "reliably appl[ied]." Fed. R. Evid. 702(c), (d). *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) ("[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'") (citation omitted). "Fit" mandates that the expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Speculation or subjective belief not based on "scientific, technical, or other specialized knowledge," is not helpful to the trier of fact and so is not admissible. *See Daubert*, 509 U.S. at 589-90; *Demetrulias v. Wal-Mart Stores*

---

[1] Unlike the single damages calculation in the original Opinion, the Revised Opinion offered two new damages "scenarios," including one which doubled back pay damages based on Equals' purported understanding of 31 U.S.C. § 3730(h). Ex. 2 at 4. Both the "back pay" and the "front pay" calculated for these two scenarios differ from each other, without explanation. *Id.* at 25.

*Inc.*, 917 F. Supp. 2d 993, 1009 (D. Ariz. 2013). "Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Moore v. Ashland Chem. Inc.*, 151 F. 3d 269, 278 n.10 (5th Cir. 1998). The failure to objectively apply a reliable method to relevant facts also renders an opinion inadmissible because "experts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an 'expert.'" *Eymard v. Pan Am. World Airways* (*In re Air Crash Disaster at New Orleans*), 795 F.2d 1230, 1234 (5th Cir. 1986). The party offering the expert witness must establish by a preponderance of the evidence that the testimony satisfies Rule 702. *See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

## ARGUMENT

Although qualified accountants may opine on lost earnings if their opinions meet the requirements of Rule 702, Equals' proffered opinion fails to satisfy those requirements. Rather than apply an accepted methodology to reliable facts, resulting in an objective calculation, Equals instead cherry-picks both data and methodology in order to achieve a desired outcome: the largest possible bottom-line number. To get this result, Equals relies on generic survey data—inconsistently selected and applied—and rank speculation, rather than record evidence. These fundamental defects in Equals' approach pervade the three critical inputs to his opinion: (1) the period Plaintiff purportedly would have remained at MDHI beyond his termination date; (2) Plaintiff's projected sales and commissions had he remained; and (3) the value of the fringe benefits Plaintiff would have received had he remained. The net result of Equals' approach—as he himself acknowledged—is an opinion that—at best—is as likely to be wrong as right. *See* Ex. 3 at 156:4-157:1 ("It all comes back down to evidence. We don't have the evidence to confirm what I have calculated to be an assertion."); *see also id.* at 121:2-6 ("And I'm saying, I don't have the evidence."); *id.* at 201:22-23 ("Somebody's right, somebody's wrong. I don't know if I'm right.").

Remarkably, Equals does not view his lack of evidence as an impediment to forming

opinions. To the contrary, he testified that the accuracy of the inputs to his calculations does not matter, based on his view that Plaintiff "deserves" to be compensated, and that quibbling over the amount of that compensation is "wasting my time":

> But this man deserves his salary and his compensation that he hasn't been paid by MD Helicopters from 2013 to whenever we get in court. And we can parse it down with a fringe rate or this and that, but in the end, it's still going to come out [sic] millions of dollars. You know, so it just seems like we're wasting my time.

*Id.* at 244:2-8. Rule 702, however, is not so lax: It requires opinions that are actually supported by reliable facts and methodology. Equals' opinion falls well short of this bar.

## I. Equals' Projected Damages Period Does Not Rest on Reliable Data or Methodology.

The Revised Opinion retreats slightly from the original Opinion's (admittedly) "arbitrary" projection of damages to age 70, fixing the end date as 2023 (age 67) based on a purported "worklife expectancy" figure as well as BLS tenure data. *Id.* at 102:22-103:18. Neither of these new bases for Equals' opinion satisfies Rule 702.

### A. "Worklife Expectancy" Is Not a Reliable Basis To Calculate Damages.

Equals first argues that Plaintiff's "worklife expectancy," *see* Ex. 2 at 50 (Schedule 11), entitles Plaintiff to damages until the age of 67. The article on which he relies for this figure, however, makes clear that "worklife expectancy" is a term of art that defines an individual's <u>total time</u> in the job market, not his time <u>at a particular job</u>. Consistent with this meaning, "worklife expectancy" is not used to estimate the length of time an individual would spend at a given job (for purposes of calculating damages resulting from a termination), but rather to estimate an individual's total "worklife" (for purposes of calculating damages resulting from a partially or fully disabling injury, including a wrongful death). *See* Ex. 2 at 156 ("In a personal injury litigation, lifetime earning capacity can be calculated as the present value of pre-injury expected earnings over the years of remaining worklife expectancy."). Equals impermissibly uses this figure to calculate Plaintiff's alleged damages, assuming—without support—that Plaintiff would have remained at MDHI for his entire remaining worklife.

Moreover, as explained by the article upon which Equals relies, these "total work-life

expectancy" figures include "the years that people perform <u>the non-market work of taking care of their homes or families</u>." Ex. 2 at 155 (emphasis added). The Revised Opinion offers no explanation as to how MDHI could be liable for Plaintiff's "non-market work." Equals' reliance on this "worklife" figure is, thus, neither a generally accepted use of that data, nor a reliable methodology, as required for admissibility.

**B. Generic Tenure Data Is Not a Reliable Basis To Calculate the Damages Period Here.**

The Revised Opinion next relies on BLS tenure data as an alternative basis for its damages period, but this new methodology is equally unsound. The BLS data is generic, aggregated data; it does not speak to the actual question here: the tenure of salespeople at MDHI. Equals admitted that he did not know the tenure of helicopter salespeople in the industry generally, or at MDHI in particular. Ex. 3 at 316:23-318:24. He likewise admitted that he did not take into account the specific data available to him regarding the tenure of a salesperson at MDHI. *Id.* at 216:2-217:20. As such, Equals' opinion lacks the "fit" necessary under Rule 702. *See, e.g., Lee v. City of Richmond.*, No. 3:12cv471, 2014 WL 5092715, at *18 (E.D. Va. Sept. 30, 2014) (excluding expert testimony on lost earnings that relied "on national averages for [the decedent's] age cohort and educational level" rather than the "personally identifiable [evidence]" available through discovery).

**1. Equals' Opinion Fails To Account for Relevant Tenure Data that Contradicts His Conclusion.**

Although particularized data about tenure for salespeople at MDHI was available to Equals, he refused to account for it. Instead, Equals contended that the data was "incomplete and irrelevant" based on his rank speculation that, "instead of naming the positions as 'sales person,'" MDHI was purportedly labeling the sales positions as 'business development'" in order to exclude relevant data. Ex. 2 at 7-8. Equals attempted to support this claim by pointing to four individuals identified on MDHI's website (the Chief Commercial Officer, the Vice President of Sales & Marketing, the Director of Business Development, and the Aftermarket Sales Manager, *see* Ex. 2 at 84), but when pressed, Equals was unable to say whether any of them held positions comparable to Plaintiff, such that their

tenure data would be relevant. Ex. 3 at 199:3-12; 200:1-201:3. Instead, Equals relied on pure speculation and unresponsive argument: "It's just a title. They're just titles. People massage titles. . . . I do know this: that companies manipulate titles all the time. It's a good way to claim one thing or another." *Id.* at 198:10-22. Equals further claimed—again with no support—that MDHI's tenure data, which illustrates the short average tenure of salespeople at MDHI, was purportedly ginned up to deceive him:

> It's an intentional, misguided document to kind of fool people like me or fool the plaintiffs. You can't say that everybody lost their job but two people, and that's what she says. No one else is working but two people anymore. . . . I believe that this data is intentionally listed here and created to mislead the plaintiff, and I think it's irrelevant, because it's not possible that a multi-million dollar company eliminated 98% of its [sales] people and only two [sales] people remain.

*Id.* at 216:2-217:6.

Although irrationally insisting the personnel data was fake—without any evidence to support that claim—Equals simultaneously took the position that "even if the hire and fire dates or termination dates are accurate," it still would not "factor into his analysis," because the <u>names</u> of the salesmen had been redacted from the data (to protect their private personnel information). But, Equals similarly lacked names—and titles and job categories— of the individuals used to compile the BLS report that he relied on for his tenure calculation. *Id.* at 209:14-210:14. Equals' rejection of the MDHI-specific tenure information because he lacked names, and his acceptance of the generic BLS data despite not having any names, demonstrates that his opinion is not driven by scientific principle, but rather by his desired outcome. This is the antithesis of a reliable methodology. *See, e.g., Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[A] selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'"(citation omitted)).

The outcome-driven nature of Equals' opinion is further shown by his rejection of record evidence validating the tenure data. Equals admitted that he never reviewed any of the testimony of MDHI salespersons in this case, and instead claimed that their first-hand knowledge of sales tenure at MDHI was irrelevant because they "don't run the company":

> My analysis isn't based on some former employee, whether he is a good employee or bad employee or terminated employee, his experience as to what

tenure should be for a person with Mr. Marsteller's education and background. That would be silly of me. It would be malpractice. . . . Why would a salesperson's observations about a company be good? Now, if you had the president of the company, if you had the chief financial officer, and we could interview them, maybe it would [be relevant]. But a person you call, quote, "a salesperson" making comments of what's going on in the company? I disagree with that. Having worked at many companies, salespeople don't run the company. The president, CEO, and the CFO and other people run the company, and they know what's going on in the company.

Ex. 3 at 218:4-220:6; *see also id.* at 221:17-228:2; 228:18-233:14. Then, when asked whether he would consider it relevant "if the CEO said that salesman didn't last very long," Equals promptly backtracked, claiming—contrary to his immediately preceding testimony—that such information was also irrelevant. *Id.* at 228:3-17. Equals similarly rejected the relevance of the testimony of MDHI's former controller in this action, claiming, based on his purported personal experience, that controllers generally "have a plan to get rid of people" and that "the controller even knows, We're going to dump these people in a few months. As soon as they make some sales, we're going to dump them. Because I'm the controller and I'm in all the meetings. I've been there." *Id.* at 233:15-235:22. Equals likewise rejected documentary evidence validating the hiring and termination dates of salespersons at MDHI, again relying on his purported personal experience and claiming that companies regularly misrepresent the reasons for termination on official paperwork. *Id.* at 281:13-288:5 ("You are naïve about—they write that [performance] on everybody that they terminate in almost every company. . . . I've—because I have other cases ongoing right now. Where women that have been sexually harassed, the men will come in. There will be depositions. They never did it. But other ladies will come in and say it really did happen. Things like that happen all the time."). Such rambling and non-technical explanations are not sufficient under Rule 702.

### 2. Equals' Opinion Relies on Cherry-Picked BLS Tenure Data.

"[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data." *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) (citing cases). The reason is simple: "'Cherry-picking' data is essentially the converse of omitting it: just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable results by looking only to 'good' outcomes." *Id.* The Revised

Opinion suffers from this methodological flaw, not only because it cherry-picks the generic BLS data over the directly relevant MDHI data, but because—even as to the BLS data—Equals carefully cherry-picks the data he uses to ensure the most favorable outcome, relying on a tenure figure that is contrary to the BLS's plain instructions and results in a significantly longer damages period than if the applicable data were used.

According to Equals, projected tenure is to be estimated based on "educational attainment"; he thus used the median tenure of men aged "55 to 64 years" with a "Master's Degree" to reach a projected tenure of more than 10 years for Plaintiff. Ex. 2 at 136. But as the BLS's guide to interpreting its data explains, "[w]orkers are classified into occupations on the basis of the work performed and the skills required in each occupation, <u>not on the basis of their education</u>." Ex. 5 at 5 (emphasis added). The Revised Opinion contains no explanation for why Equals disregarded this interpretive guidance, nor why Plaintiff's graduate degree would be relevant to his tenure at a sales job that did not require such a degree. When challenged on his choice, Equals speculated that "people who have master's degrees and doctor's degrees, they're in a different class. They can work in different ways. And if they get a job, they should be able to hold a job." Ex. 3 at 193:11-20.

The Revised Opinion also relies on a BLS graphic that shows employee tenure by occupation, bracketing the categories for "Production, transportation, and material moving" as well as "Management, professional, and related," each of which show higher percentages of employees with tenure of "10 years or more" than other occupations. But here too, Equals failed to explain his inconsistent use of BLS data: for his benefits calculation, as discussed below, Equals relied on the highest figure available: the number applicable to the aircraft manufacturing industry. But for purposes of determining the damages period, Equals ignored the tenure data for both "Natural resources, construction, and maintenance," the category into which the aircraft manufacturing industry falls, and "Sales and office," the category into which Plaintiff's actual occupation falls. Both categories have lower tenure numbers than the two inapplicable categories on which Equals relies. Indeed, as shown by a portion of the BLS report omitted from the Revised Opinion, <u>the BLS data demonstrates</u>

that the national average tenure of workers in sales is 3.4 years—nearly identical to the average tenure of MDHI salesman (3.08 years).  *Compare* Ex. 6 at Table 6, *with* Ex. 2 at 84.  Equals' non-scientific cherry-picking of data, along with the many other shortcomings in his opinion, renders his opinion inadmissible under Rule 702.

## II.     Equals' Sales Projections Do Not Rest on Reliable Data or Methodology.

Equals' sales projections likewise run afoul of Rule 702.  Equals assumes a 10% annualized growth in Plaintiff's <u>personal</u> sales based solely on a 2015 press release that mentioned <u>MDHI's</u> "double digit" growth over the preceding decade.  In applying that assumption, Equals simply ignores the record evidence that Plaintiff <u>never</u> achieved any comparable success selling helicopters, either before or after his termination.  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002).

### A.     Equals' Projection of 10% Annual Sales Growth Does Not Rest on Reliable Data.

In his Revised Opinion, Equals abandons Plaintiff's actual MDHI sales data and instead uses a 2015 MDHI press release mentioning "double digit" sales growth from 2005 to 2015, using this reference to "compute a foundation of sales and commissions relevant to Mr. Marsteller."  Ex. 2 at 8; *see also id.* at 14.  Equals offers no evidence that press releases are among the data points typically relied on by CPAs in non-litigation work.  Fed. R. Evid. 703.  He also could not explain how a general reference to company-wide sales <u>as a whole</u>—which includes both military and commercial sales—is more "relevant to Mr. Marsteller" than Plaintiff's <u>actual</u> sales.  Indeed, Equals admitted that he did not know if the "double digit" growth would apply to Plaintiff, whom Equals acknowledged was involved only in, and thus entitled to commissions only on, commercial sales.  Ex. 3 at 155:3-159:18; 158:4-6.  The press release, however, expressly linked MDHI's growth to <u>military</u> sales, *see* Ex. 2 at 68, and other publicly available information from the same time period describes military sales as 70% of MDHI's business, *see* Exs. 7-8.  Equals also has no evidence that the reference to

"double digit" growth was annualized, as opposed to simply covering the ten-year span in the press release. Despite the lack of evidence that the cited "double digit" growth is annual, applies to commercial sales, or includes sales in Latin America (the region Plaintiff covered), Equals arbitrarily selected and applied an annual 10% growth rate in projecting Plaintiff's future commissions. Ex. 3 at 154:4-155:7.

Equals' deposition testimony demonstrated a further error in his commission calculation: He assumed that all commercial sales of a particular helicopter model would result in a commission payable to Plaintiff, regardless of who actually made the sale. Ex. 3 at 70:9-71:25 (testifying that Plaintiff "was hired to sell a particular model, a series" and if he had not been terminated "he would still be getting his approximately 1 percent of the sale of those."); *id.* at 86:12-87:20 ("[I]f his commission was 1 percent, and then, the day after [his termination] through today . . . they sold 50 of the same family of helicopters or the same civil configuration, then I said he should get—for the really perfect world, he should get 50 times his commission times those helicopters"). Plaintiff received commissions <u>only</u> for sales he was personally involved in, and he only sold into Latin America—a fact Equals did not know. *Id.* at 161:20-162:2 ("I don't know if he was limited to Latin America."). Equals' faulty methodology therefore grossly exaggerates Plaintiff's purported damages.

**B.    Equals' Rejection of Plaintiff's Actual Sales Performance as Relevant Data Rests on Pure Speculation.**

Equals also fails to explain why Plaintiff's actual sales—which occurred during the "double digit" growth period mentioned in the press release—did not already accurately reflect Plaintiff's sales performance under such conditions. Moreover, in calculating supposedly lost commissions, Equals ignores not only Plaintiff's actual MDHI sales performance, but also his post-MDHI sales performance. Although acknowledging that Plaintiff tried, and failed, to sell helicopters at both his own company and another company after his termination, Equals unscientifically attributed Plaintiff's lack of success to speculation that he was "blackballed," rather than any lack of sales ability on Plaintiff's part. Ex 3 at 80:2-81:16; *see also id.* at 77:12-78:16 ("And consequently, if he is unable to—if what

you're hypothetically saying—is all I can figure out, it's hypothetical—that he didn't sell helicopters, his reputation harshly damaged by MD Helicopters by terminating him in one day on August 23, 2013, I guess."); *id.* at 244:10-246:4 ("So I think MD Helicopters is responsible for his past years of not being successful."); *id.* at 247:22-248:16 ("I'm sure that there are problems of some kind, that the prejudice caught up to him from his old job from MD Helicopters.").

In justifying his projected sales calculations, which represent a substantial increase over Plaintiff's actual sales at MDHI, Equals first relied on the general nature of the sales at issue. *Id.* at 117:6-7 ("He's not selling toilet paper. He's selling million-dollar helicopters."). But Equals then admitted that he did not know, and had done nothing to learn, either the average number of sales by helicopter salespeople (either at MDHI or nationwide), or the average salaries of such salespeople. *Id.* at 318:25-322:2. Equals then pointed to a single data point in support of his projections: a single annual commission total in excess of $300,000 that was earned by only one of ten MDHI salespersons, and in only one of the four years represented. *Id.* at 117:6-11; 118:3-119:24. When challenged as to the non-representative nature of that commission, Equals speculated that MDHI must have a practice of firing successful salespeople. *Id.* at 121:2-5 ("And I'm saying, I don't have the evidence, but the pattern is, you make a lot of money, we're going to fire you. That's what it looks like on paper."). When informed that the salesperson at issue had himself testified that his one-year commission total was an "outlier," Equals further speculated that such testimony was part of a scheme to minimize Plaintiff's damages:

> In my opinion, the word—term "outlier" is when parties don't want to use the data for relevant evidence. Obviously, it's not an outlier. It's part of the company's facts, history. And that's exactly what the court reporter just read back to you that we're missing. We don't have a list of all the data so we can tell what is really an outlier, if there was an outlier, or is this the relevant data I should be using to compute Mr. Marsteller's future lost earnings? Maybe he lost 324,000 a year for the past four years and my damages are way understated. Maybe he should be like this individual and make that much money. So, no, I don't believe in the term "outlier." I think it's a way to hide—another way to hide the information that would help Mr. Marsteller be compensated for his lost wages and salaries and commission.

*Id.* at 126:18-127:15. Equals' inability to point to objective facts to justify his methodology,

and his insistence instead on engaging in speculation and argumentative conspiracy theories to support it, demonstrate that his opinion fails to satisfy Rule 702.

III. **Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Data or Methodology.**

In calculating the value of the benefits that Plaintiff no longer receives from MDHI, the Revised Opinion again jettisons the actual evidence in this case in favor of generic BLS data. In fact, the Revised Opinion doubles down on the "Calculated Benefits" percentage, increasing it to "up to 69.3% of wages and salaries" annually. Ex. 2 at 14. But this calculation is not based on the actual benefits that Plaintiff received. As Equals admitted, he does not know (and did not ask) what categories of benefits Plaintiff received. Ex. 3 at 168:23-25. In fact, according to Equals, the actual benefits Plaintiff received are irrelevant: "It's interesting data, but it's not relevant for me to compute what he lost in benefits and fringe rates." *Id.* at 186:3-8. Instead, Equals opined that generic BLS survey data is "absolutely" "more relevant than the actual benefits received" by Plaintiff, because it includes the value of benefits that Plaintiff never used, like disability leave. *Id.* at 186:17-187:20. But Equals never explained the basis—factually or methodologically—for calculating Plaintiff's "lost" benefits to include the full amount of benefits available to him but never used, such as disability insurance, rather than the amount that MDHI paid for such contingent benefits (i.e., the amount Plaintiff would need to pay to continue them post-termination). Equals' approach is thus facially flawed: it is akin to calculating the value of a life insurance benefit based on the face value of the policy, rather than on the amount paid to keep the policy current. Rule 702 prohibits such "unrealistic and contradictory" assumptions. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

A. **Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Data.**

As with Equals' other inputs, the BLS benefits data he uses is not reliable under the facts of this case, rendering the opinion inadmissible. *Moore*, 151 F.3d at 278 n.10 ("Under *Daubert,* any step that renders the analysis unreliable renders the expert's testimony inadmissible."). Although Equals omitted it from his Revised Opinion, the detailed

breakdown of benefits in the BLS report shows that the majority of benefits that he continues to rely on for his "Calculated Benefits" percentage were either unavailable to Plaintiff or already encompassed in his salary. For example, the BLS data includes a "retirement and savings" category, which identifies the average cost to an employer of both defined benefit (pension) and defined contribution (401(k)) plans. Ex. 9 at 5 (Table 1). But Equals admitted he does not know (and did not ask) which of these Plaintiff received. Ex. 3 at 272:23-274:4. The BLS report also identifies "supplemental pay"—which includes overtime and premium pay, shift differentials, and nonproduction bonuses—as one component of its benefit calculation. Ex. 9 at 5 (Table 1). But as a salaried worker, none of those categories apply to Plaintiff. Similarly, the BLS report includes "paid leave" (vacation, holiday, and sick pay as well as personal leave) as a category of benefits. Ex. 9 at 5 (Table 1). But again, as a salaried worker, the value of such benefits was not paid separately to Plaintiff. Ex. 3 at 270:2-272:22. Equals admitted that salaried workers are generally not paid separately for holidays, and yet he insisted that his "Calculated Benefits" percentage—which includes a separate component for such pay, above and beyond "wages and salaries"—was nonetheless a proper yardstick to measure Plaintiff's lost benefits. *Id.* at 275:24-278:17.

The paid leave category illustrates another fundamental error in Equals' reliance on BLS data for his "Calculated Benefits" percentage. As its title indicates, the BLS report reflects "<u>employer</u> costs for employee compensation." Ex. 2 at 126 (emphasis added). But the employer's <u>cost</u> to provide a benefit does not automatically correlate to the <u>value</u> received by the employee. As a salaried worker, Plaintiff did not receive more pay if he worked on a holiday, nor less pay if he did not work that day. By contrast, the cost to MDHI varied: on a holiday, for example, MDHI continued to pay Plaintiff's salary, but did not receive any corresponding work in exchange. Equals' calculations underscore this disconnect between the facts of the case and the data he relies on, as applying his "Calculated Benefits" percentage results in the astonishing—and wholly counter-factual—conclusion that Plaintiff received benefits of more than <u>$90,000</u> in 2013. Ex. 2 at 32.

Equals' reliance on BLS data, rather than the actual data, regarding Plaintiff's benefits

is unreliable for an additional reason: Equals carefully cherry-picked the BLS figures that he used in his Revised Opinion, ignoring, without any explanation, a variety of measures that apply to Plaintiff, but that would result in a much lower damages calculation. In creating his "Calculated Benefits" percentage, Equals picked the cost per hour worked for benefits for "all workers" in the "aircraft manufacturing" industry ($24.83) (Table 10), ignoring the cost per hour worked for benefits for all workers in "sales and office" ($6.60) (Table 5); for all full-time workers in "sales and related" occupations ($7.85) (Table 11); for all workers in the West-Mountain region, which includes Arizona ($8.08) (Table 7); or for all workers in "sales and related" occupations in "goods-producing industries"—such as aircraft manufacturing ($8.34) (Table 9). *Compare* Ex. 2 at 18 (acknowledging Plaintiff worked in "the Goods-Producing aircraft industry"), and 127 (Table 10), *with* Ex. 9 at Tables 5, 7, 9, 11.

At his deposition, Equals tried to defend his reliance on benefits figures for the aircraft manufacturing industry, rather than ones more closely tied to Plaintiff's actual occupation as a salesman, by pointing to Plaintiff's military service and then inventing and speculating wholesale additional job skills and responsibilities for him:

> Q:    Mr. Marsteller was a salesman, right?
> A:    He's not just a salesman. Let's see. Ex-military. A couple of college degrees. He can fly helicopters. He can jump out of planes. You know, he's one of the people that helped defend this country. He's not just an ordinary salesman. That's an insult to a military veteran. Think about it. So no, he's not just a salesman like down at the Chevrolet dealership.
> Q:    My question is, did he manufacture helicopters?
> A:    He probably helped manufacture. I've been with these people where they manufacture spacecraft and airplanes. They are smart guys. If they fly them, they know how to build them. So he probably was on the line. He knows what to look for. But he's not just a salesman beating the bushes.

Ex. 3 at 171:21-172:13. Contrary to Equals' speculation, however, it is undisputed that Plaintiff had no role in manufacturing helicopters at MDHI.

## B. Equals' "Calculated Benefits" Percentage Does Not Rest on Reliable Methodology.

Equals exacerbates his reliance on inapplicable, overstated data with a methodological error. The BLS data identifies aggregate figures for the cost per hour worked of total

compensation, which it then breaks down into (1) wages and salaries, and (2) benefits. *See, e.g.*, Ex. 2 at 127. Those figures are represented both in actual dollars and as percentages of total compensation. Equals' "Calculated Benefits" percentage divorces these two measurements from their meaning by taking the percentage cost of benefits—which is expressly linked to, and calculated based on, the cost per hour worked—and applying it directly to Plaintiff's compensation. But Plaintiff's base salary significantly exceeded the hourly compensation figure used in the BLS data. In fact, the hourly compensation figure from the "aircraft manufacturing" industry category relied on by Equals annualizes to $83,380.[2] For 2013, the resulting difference in the cost of benefits between the BLS report and Equals' calculation is an extra $27,690—before application of the "Calculated Benefits" percentage to commissions (a separate error discussed below). *Compare* Ex. 2 at 127 (Table 10), *with* Ex. 2 at 32 (Sched. 4). Equals does not identify any basis to support his assumption that the cost of benefits increases directly and arithmetically as compensation increases. Simple logic dictates that it does not. For example, the cost of health insurance depends on many factors, including age, gender, and general health. It does not, however, depend on how much Plaintiff earns. This basic methodological error infects Equals' entire benefits calculation and increases over time, as each increase by Equals in Plaintiff's projected salary results in a corresponding overstatement of Equals' "Calculated Benefits."

Equals further compounds this error by multiplying the "Calculated Benefits" percentage against not only Plaintiff's salary, but also commissions. Just as there is no basis (in either the evidence or any reliable methodology) to support increasing the cost of benefits with each salary increase, there is no basis to further increase the cost of benefits based on hypothetical commissions. For example, the cost of Plaintiff's health insurance was fixed annually—it would not have increased if Plaintiff sold a helicopter, nor decrease

---

[2] This figure is calculated by multiplying the cost per hour worked for "wages and salaries" for workers in the aircraft manufacturing industry (the figure selected by Equals) by a standard 40 hour work week for 50 weeks per year (assuming two weeks of paid holidays/vacations): 40 x 50 x $41.69 = $83,380.

when he failed to do so. Indeed, the express basis of the BLS report—"costs <u>per hour worked</u>"—refutes any such conclusion, as commissions are not based on hours worked.

Equals' defense of his decision to multiply his "Calculated Benefits" percentage against commissions is a revealing non-sequitur: "[T]he U.S. Internal Revenue Service regulations tax commissions the same as any hourly wage, and regulations under ERISA require that all wages and salaries [and commissions] be counted for pensions, and medicare tax on an unlimited basis." Ex. 2 at 14 (second alteration in original). The fact that commissions are taxed does not provide a methodologically sound basis to assume that roughly 60% to 70% of commissions should be paid out again as a form of "lost" benefits. Plaintiff does not have to pay taxes on such benefits unless they are actually received, so to justify payment of those amounts on the theory that, once paid, they would be taxable, is a classic logical fallacy. Equals' reliance here on the tax regulations is both methodologically flawed and highly ironic, given that <u>Equals rejected Plaintiff's own W-2s (showing the actual taxable value of his benefits) as unreliable</u>. Ex. 3 at 167:19-168:22. The illogical results produced by Equals' multiplication of his invented "Calculated Benefits" percentage against both salary and commissions is patent: according to the Revised Opinion, by 2017, the value of Plaintiff's "lost" benefits would exceed Plaintiff's total salary at the time of his termination. Ex. 2 at 33 (showing "Calculated Benefits" of $134,414 for 2017).

## CONCLUSION

A Rule 702 expert cannot rely on speculation, cherry-picked data, unsupported argument, and a flawed methodology to advance an unscientific and biased opinion. Equals' many errors infect his opinion and render it inadmissible. For the foregoing reasons, the Court should exercise its gatekeeping function and exclude his opinion testimony.

| | |
|---|---|
| DATED:  September 19, 2017 | Respectfully submitted, |

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.

WILLIAMS & CONNOLLY LLP

By: s/ L. Eric Dowell
     L. Eric Dowell (AZ Bar No. 011458)

By: s/ Christopher N. Manning
     Christopher N. Manning (pro hac vice)
     Edward C. Reddington (pro hac vice)
     Juli Ann Lund (pro hac vice)
     Tracey A. Fung (pro hac vice)
     David M. Berman (pro hac vice)

2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone:  (602) 778-3700
Facsimile:    (602) 778-3750
Eric.dowell@ogletreedeakins.com

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile:   (202) 434-5029
cmanning@wc.com
ereddington@wc.com

*Attorneys for Defendant MD Helicopters, Inc.*

# **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of September, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Ruth Brown
Heather Lewis Donnell
Michael Kanovitz
Frank Newell
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
ruth@loevy.com
heather@loevy.com
mike@loevy.com
frank@loevy.com

*Attorneys for Plaintiffs Ruth and Philip Marsteller*

s/ Susan Stimson

31270052.1