Michael Kanovitz, *pro hac vice*
Heather Lewis Donnell, *pro hac vice*
Ruth Brown, *pro hac vice*
Frank Newell, *pro hac vice*
LOEVY & LOEVY
311 North Aberdeen, 3rd FL
Chicago, IL 60607
Telephone:   (312) 243-5900
mike@loevy.com
heather@loevy.com
ruth@loevy.com
frank@loevy.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| PHILIP A. MARSTELLER and RUTH MARSTELLER, | CASE NO. CV-14-01788-PHX-DLR |
| Plaintiffs, | **PLAINTIFFS' MOTION CHALLENGING EXPERT TESTIMONY PURSUANT TO FED. R. EVID. 702 AND *DAUBERT*** |
| v. | |
| MD HELICOPTERS, INC., | |
| Defendant. | |

Plaintiffs Philip and Ruth Marsteller, by and through their attorneys, LOEVY & LOEVY, hereby respectfully move this Court to bar certain opinions of Ms. Karen Engstrom, the expert retained by Defendant, MD Helicopters, Inc. ("MDHI"). Plaintiffs' motion should be granted for the reasons stated below.

## INTRODUCTION AND BACKGROUND

In this whistleblower retaliation case, Plaintiffs Philip and Ruth Marsteller respectfully request that this Court bar certain opinions offered by Ms. Karen Engstrom, MDHI's retained expert.

On August 23, 2013, a preservation of evidence letter ("DOJ Preservation

Letter") was served on MDHI by the Department of Justice just hours before Defendant fired Mr. Marsteller. Long before the arrival of the DOJ Preservation Letter at MDHI, Mr. Marsteller had reported his concerns to MDHI management that MDHI was overcharging the U.S. government for helicopters and that MDHI's hiring of former U.S. Army colonel, Norbert Vergez, represented an improper conflict of interest. Moreover, Mr. Marsteller provided assistance to the government investigation into MDHI's pricing of helicopters provided to the U.S. government, as well as the criminal prosecutions and  convictions of Col. Vergez and the contract officer who worked under Col. Vergez, who had contract authority of MDHI's contracts with the U.S. Army. Mr. Marsteller asserts that he was terminated by MDHI in a retaliatory reaction to MDHI's receipt of the DOJ Preservation Letter. MDHI does not dispute the timing of Mr. Marsteller's termination and its receipt of the DOJ Preservation Letter, but claims that he was terminated for other reasons.

As a direct result of being wrongfully terminated from MDHI, Mr. Marsteller has been unable to find employment that even remotely resembles, on any number of dimensions (*e.g.*, duration of employment, job duties and responsibilities, and/or salary), the sales position he occupied at MDHI. Mr. Marsteller has provided extensive documentation, including tax filings and discovery responses, many of which were even reviewed by Ms. Engstrom in conjunction with her report, of his post-MDHI employment history, which entails a brief tenure at John Hopkinson & Associates starting in August 2014 and providing consulting services in 2016 (neither of which generated substantial income), and working at his wife's restaurant (for which he does not even draw a salary). Exhibit ("Ex.") D, (Group

Exhibit of 2014-2016 Mr. Marsteller's Tax Filings); Ex. C., (Group Exhibit of Plaintiffs' Interrogatory and Supplemental Interrogatory Responses).

Nevertheless, MDHI has deployed Ms. Engstrom to author an opportunistic and revisionist account of Mr. Marsteller's post-employment history and prospects to inflate mitigation totals or even invent them out of whole cloth. However, Ms. Engstrom's unconvincing version of Mr. Marsteller's post-MDHI employment falls apart upon the slightest scrutiny and is ultimately betrayed even by her own deposition testimony, in which she admits that the alleged bases for her mitigation calculations are built on sand and are not actually "expert opinions *per se*." We agree with Ms. Engstrom and urge the Court to adopt Ms. Engstrom's view on this score as her mitigation analysis is rooted in speculation and unfounded assumptions, not facts and data, and thus does not conform to the standards set forth under *Daubert* or Federal Rule of Evidence 702; moreover, Ms. Engstrom, on the one hand, claims that there is not a standard methodology to determine "substantially equivalent employment," yet she plows ahead nevertheless with a cherry-picked, improper methodology that is custom-fit to balloon mitigation totals and eviscerate Mr. Marsteller's rightful damages by deeming employment to be "substantially equivalent" without regard for duration of the employment or salary (let alone whether the salary is commensurate with the position from which the employee was terminated).

Ms. Engstrom also attempts to illegitimately abridge Mr. Marsteller's damages through unrecognized techniques as she truncates the damages period according to a nebulous assessment of how long Mr. Marsteller would have worked

3

at MDHI (between one and three years, according to the report), allegedly based on a comparison to other MDHI employees' tenures at MDHI.  This approach flies in the face of the widely-accepted methods used to set damages periods which are based upon tables generated by reputable, established sources, rather than deferring to employment timetables set to the hiring and firing practices of a company that, taking the facts in the light most favorable to Plaintiffs, has acted in bad faith to punish whistleblowers for raising concerns and alerting the government to frauds committed by that company. The way in which Ms. Engstrom has reduced the damages period ventures beyond unorthodoxy and is simply an unacceptable methodology that squarely fails to satisfy the standards under *Daubert* and the Federal Rules of Evidence. The Court should not countenance Ms. Engstrom's conclusory opinions and unacceptable analyses, admittedly unmoored from facts, which ultimately amount to no more than transparent attempts to erase Mr. Marsteller's damages while masquerading as viable methods. Accordingly, this Court should bar Ms. Engstrom's impermissible opinions on mitigation and the damages period.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

4

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. District courts employ the following analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463–64 (9th Cir. 2014) (citing *Daubert* and Fed. R. Evid. 702).

## DISCUSSION

### I.   Ms. Engstrom's Opinions As To Mitigation Fail to Satisfy *Daubert* and Fed. R. Evid. 702 And, Thus, Should Be Barred.

Ms. Engstrom's report asserts that substantial mitigation ought to be subtracted from her calculations of Mr. Marsteller's back pay and front pay damages. However, Ms. Engstrom's analysis contains a fatal flaw. She sets the mitigating earnings rate at $130,000 annual salary beginning on September 2014 (based on the approximate date when Mr. Marsteller began working at John Hopkinson & Associates) without factual support for doing so. Namely, Mr. Marsteller has never earned $130,000 in any year since MDHI terminated his employment. Ex. D. (Group Exhibit of 2014-2016 Mr. Marsteller's Tax Filings); Ex. A, (Engstrom Report) at 16-17. Moreover, Ms. Engstrom revealed her central, but inaccurate, assumption, that Mr. Marsteller's employment at John Hopkinson & Associates ("Hopkinson") was somehow akin to his position at MDHI as she writes that "Mr. Marsteller was hired by John Hopkinson & Associates on or around August 27, 2014, to serve as their senior sales executive and broker" and "[b]ased

upon the above information, it appears that Mr. Marsteller obtained employment substantially equivalent to MDHI on or around August 27, 2014." *Id.* at 5.

Ms. Engstrom carries these inaccurate assumptions forward to design her mitigation model as she writes (at footnotes 32 and 35) of the $130,000 mitigation baseline, "I have conservatively estimated a comparable salary at MDHI and no sales commissions," yet in the very next sentence, she writes, "Should additional information becomes [sic] available regarding Mr. Marsteller's *actual terms of employment* with John Hopkinson & Associates or income from his other business ventures, I reserve the right to update my analysis accordingly." *Id.* (emphasis added). This is a concession by Ms. Engstrom that her calculations are based on the unjustified assumption that Mr. Marsteller's position at Hopkinson was "substantially equivalent" to his position at MDHI rather than being based on the *actual terms* of Mr. Marsteller's post-MDHI employment. As outlined further below, there is no sound basis for Ms. Engstrom's mitigation calculations, which are based on conjecture rather than facts and coherent methods, and thus must be barred for failing to meet the standards set forth in Rule 702 and *Daubert*.

### A. Ms. Engstrom Acknowledged That Her Mitigation Assessment Does Not Constitute An Expert Opinion.

Ms. Engstrom admitted in her deposition testimony that her assessment that Mr. Marsteller obtained "substantially equivalent employment," the key determination that her mitigation calculation is premised upon, does not rise to the level of an expert opinion. When asked: "So in your report you expressed your opinion that Mr. Marsteller had obtained employment substantially equivalent to MDHI on or around August 27, 2014?" Ms. Engstrom provided the telling reply, "I don't know that that's an expert opinion, *per se*, but it's a factor that goes into my

overall opinion regarding damages" and further stated "every single statement in here is not an opinion. There's a lot of discussion."  Ex. B, (Engstrom Deposition) at 62:13-63:11. In response to the subsequent question, "So you don't consider the statement that we just read to be an expert opinion of yours. You consider your expert opinion to cover the damages assessment?" Ms. Engstrom answered, "That's correct." *Id*. at 63:7-11. As the expert herself admits that her basis for deducting significant mitigation from Mr. Marsteller's damages is not informed by an expert opinion, the Court should discard Ms. Engstrom's mitigation assessments as they are based on nothing more than "discussion" rather than the kind of rigorous analysis required under *Daubert* and the Federal Rules of Evidence.

### B.  No Coherent Methodology Underlies Ms. Engstrom's Assessment That Mr. Marsteller Attained "Substantially Equivalent Employment."

Ms. Engstrom also testified at her deposition that she is not aware of a precise definition of "substantially equivalent employment," a term that she fundamentally relies upon in a mitigation calculation that is inextricably linked to her assumption that Mr. Marsteller was able to attain "substantially equivalent employment." Ms. Engstrom then goes on to make it up as she goes along, exploiting her amorphous notion of "substantially equivalent employment" to frame the concept in such a way as to maximize mitigation, minimizing damages.

### 1.  Ms. Engstrom Admits That Her Version of "Substantially Equivalent Employment" Is Not Based On A Well-Accepted Definition.

In addition, Ms. Engstrom's use of the term "substantially equivalent employment" is not supported by the record nor does she apply a recognized

7

methodology in the field of vocational economics to support her use of it. Rather, it is a merely a fancy phrase to attempt to characterize Mr. Marsteller's post-termination employment as equivalent to his prior employment terms at MDHI.

On that score, Ms. Engstrom testified that the term "substantially equivalent employment" is not a term that is used in her field or one that is a defined term.  Ex. B at 87:11-24. Moreover, Ms. Engstrom was unable to answer whether any literature in her field existed defining the term. *Id*. at 88:3-6. This, in itself, is grounds for barring Ms. Engstrom's opinion as she utilizes a concept, to achieve her aim of reducing Mr. Marsteller's damages, without rooting it in any kind of well-established understandings of "substantially equivalent employment" or recognized methodology within her field of expertise.

### 2. Ms. Engstrom Opts For a Definition of "Substantially Equivalent Employment" That Suits Her Desire To Maximize Mitigation.

Ms. Engstrom gives a varied and shifting definition of "substantially equivalent employment" that demonstrates  that she is not utilizing a well-accepted framework from her field of vocational economics, but rather permits her to pick and choose the definition most amenable to reducing Mr. Marsteller's damages. When asked to provide her understanding of the term, Ms. Engstrom waffled as she testified that "substantially equivalent employment" means "a job in the same industry, performing the same type of work," but could also mean, "in another field where they have a substantially equivalent earnings. I think it could have multiple meanings." Ex. B. 88:15-16, 88:22-25. Upon being asked, "[W]hen do you look at just whether the work is in the same industry performing the same type of work and

when do you alternatively consider whether the earnings are equivalent," she replied "I think it varies case to case, depending on the facts and circumstances of the case." *Id.* at 90:19-91:5.  And when pressed as to "why, in this case, did you not consider whether Mr. Marsteller had obtained substantially equivalent earnings in reaching the conclusion that he had received substantially equivalent employment on a particular date?," Ms. Engstrom stated, "because it is the same type of industry doing the same type of work." *Id.* at 91:6-91:19.

Ms. Engstrom's varied definitions indicate that she is applying an *ad hoc* approach, which ignores salary and other information available to Ms. Engstrom (that Mr. Marsteller's W-2 "reflects earnings of $22,916.67 in 2014" and that Mr. Marsteller was no longer working at Hopkinson as of February 2015) suggesting that Mr. Marsteller had a very brief tenure with Hopkinson and did not derive an income level at all comparable to what he was earning at MDHI.  Ex. B at 4-5; Ex. A. 77: 18-21. Instead, Ms. Engstrom only zeroes in on factors which would be helpful in bolstering her claim that the Hopkinson job was comparable to the MDHI position. Indeed, even if Ms. Engstrom were to be presented with proof that Mr. Marsteller had not "obtained a significant amount of income since his termination," Ms. Engstrom doubles-down, undeterred, and unequivocally states that "No," this would not affect her calculations, even though she admitted that level of earnings could be taken into account in determining whether an employee has found "substantially equivalent employment." Ex. B. at 78:3-8. Ms. Engstrom has not defined or used an accepted methodology, and then goes on to exploit her amorphous approach by

9

adopting a self-serving method of determining "substantially equivalent employment," and thus runs afoul of *Daubert* once again.

### C. Ms. Engstrom's Mitigation Analysis Is Not Supported By Sufficient Facts and Data.

Ms. Engstrom lacks a basic threshold of facts and data to support her mitigation assessment. When asked if she had "any information at the time you completed your report about whether Mr. Marsteller's employment with John Hopkinson & Associates was on a "full- or part-time basis," Ms. Engstrom admits that she did not. Ex. B at 74:11-20. Moreover, in claiming that mitigation is in order, Ms. Engstrom cites to the fact that "Mr. Marsteller's LinkedIn profile lists him as Principal of Carefree Aviation Partners since September 2013" and that "Carefree Aviation Partners has had at least one helicopter sale for a profit of $25,000" along with stating that "Mr. Marsteller and his wife opened a restaurant, Carvalho's Brazilian Steakhouse" and "it is likely that any involvement that Mr. Marsteller has had with the restaurant may have resulted in earnings." Ex. A. at 4-5. Ms. Engstrom plainly is predicating mitigation on employment about which she lacks a sufficient factual foundation as she admits that it is possible that Carefree Aviation's profit may have merely been revenue. Ex. B at 66. Moreover, her report's claim that the restaurant "may have resulted in earnings" is already ripe for disqualification under *Daubert*, and her testimony further confirms the utter lack of facts underlying her assertions, with regard to the restaurant, that she "didn't have information to know one way or the other" what Mr. Marsteller may have earned from the restaurant; she then invokes generalities and assumptions in lieu of data, going on to say,

10

"typically, if somebody has a business that is sustained over some period of time and there are earnings, an owner draws profit out of the business, may draw a salary, there are different ways that you can have earnings from a self-employed business." *Id*. at 68:24-69:5. This barrage of platitudes and hedging cannot possibly be allowed to undergird and justify Ms. Engstrom's mitigated earnings calculations.

Ms. Engstrom has not laid the groundwork of a factual basis for the alleged foundations of her mitigation calculation, and she papers these gaping holes with an anti-methodology which seeks to prop up her conclusory assertion that Mr. Marsteller found "substantially equivalent employment."

Indeed, Ms. Engstrom admitted that, if her exaggeration of mitigation beyond all reasonable bounds were taken out of her damages equation, damages would increase by $12,000, $197,045, $185,000, or even up to $1.2 million, depending upon the scenario. Ex. B. at 168:12-14; 169:4; 170:13.

Ms. Engstrom's complete lack of factual basis to support her mitigation calculation simply does not pass muster under *Daubert*, and, therefore, Ms. Engstrom's mitigation earnings calculation of $130,000 must be barred.

**II.    Ms. Engstrom's Truncated Damages Period Is Not Based On a Proper Methodology Pursuant to *Daubert*.**

Ms. Engstrom based the period, for purposes of calculating Mr. Marsteller's damages, on MDHI-specific tenure data generated by Ms. Engstrom herself. First, in Table 1 of Ms. Engstrom's report, she purports to show that the "average duration for an MDHI sales professional is 3.08 years" (based on a sampling of less than 30 MDHI sales professionals since 1999). In Chart 1 of the report, Ms. Engstrom

attempted to show "MDHI Tenure Data Over Time" and posits (based on a sample size of a mere three employees) that 1.08 years is the average duration of an MDHI sales professional after the government launched its investigation into MDHI. Ex. A. at 8-10. Ms. Engstrom then applies these 1.08 to 3.08-year-tenures in using a truncated damages period that cuts off Mr. Marsteller's damages after 1.08 and 3.08 years respectively. *Id.* at 16-18. She then employs one of the standard worklife expectancy tables from her field using a damages period based on data from the Bureau of Labor Statistics ("BLS"), however she weights this scenario to a reduced likelihood of a mere 10% without providing any accepted practice for doing so recognized in the field of vocational economics.. *Id.* at 16-18.

Ms. Engstrom invokes data that are highly limited in scope and sample size in population and duration and culled from MDHI alone, and, yet, these data are foisted upon the Court as if they are more reliable than the vast, highly-specific, and reputable data generated by the BLS; Ms. Engstrom's figures on MDHI tenure are the antithesis of a peer-reviewed, standardized approach demanded under *Daubert*, in contrast to BLS data that exemplify data that have been subjected to rigorous screening such that they can be trusted. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) ("[I]n evaluating the reliability of scientific expert opinion testimony, trial courts may consider: '(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.') (citations omitted); *see also Wright v. Berryhill,* No.

12

15-55282, 2017 WL 2645298, at *1 (9th Cir. June 20, 2017) (citing the BLS as a "reliable source."). This Court should not allow Ms. Engstrom to substitute the reliability of BLS data for a set of calculations untested, unreviewed, but customized to meet MDHI's desired ends of cutting off damages to which Mr. Marsteller is entitled.

Accordingly, the Court should bar any damages calculations that utilize a damages period based on the MDHI-specific tenure data at Table 1 and Chart 1 of Ms. Engstrom's report.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to bar certain expert opinion testimony at trial by Ms. Engstrom as described above

Dated: September 19, 2017          RESPECTFULLY SUBMITTED,


                                   /s/ Frank Newell
                                   Attorneys for Plaintiffs


Michael Kanovitz, *pro hac vice*
Heather Lewis Donnell, *pro hac vice*
Ruth Brown, *pro hac vice*
Frank Newell, *pro hac vice*
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2

3

    I, Frank Newell, an attorney, certify that on September 19, 2017, I served the foregoing on counsel of record via the CM/ECF filing system.

4

                               /s/ Frank Newell

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14